10 P.3d 176

2000-NMCA-080

**Pedro TARTAGLIA, Individually and as Personal Representative of the Estate of Joseph T. Tartaglia, a/k/a Joe Tartaglia, deceased, Plaintiff/Counterdefendant–Appellee,**

v.

**Karen Lynne HODGES, Individually and as Successor Trustee of the Romi Tartaglia Revocable Living Trust; and Albert John Meteney, Jr., Defendants/Counterclaimants–Appellants,**

v.

**Leo Tartaglia, III, Connie Tartaglia, and All Unknown Heirs of Leo Tartaglia, Jr., Counterdefendants–Appellees.**

No. 19,749.

Court of Appeals of New Mexico.

July 10, 2000.

Certiorari Denied, No. 26,481, September 11, 2000.

William J. Darling, Margaret P. Armijo, William J. Darling & Associates, P.A., Albuquerque, NM, for Appellants.

Avelino V. Gutierrez, Gutierrez Law Offices, Albuquerque, NM, Robert T. DeVoe, Albuquerque, NM, for Appellee.

## OPINION

SUTIN, Judge.

{1} This is a dispute over ownership of a family home. Based primarily on statements attributed to deceased declarants, the trial court imposed trusts on the property in favor of all family members thereby defeating deeds by which one family member held legal title. The holder of that legal title appeals. We affirm.

## BACKGROUND

### The Immediate Family

{2} Romelia Tartaglia, who died in September 1966, had five children: Romi (Tartaglia) Meteney, the oldest, who died in March 1995; Carlos Tartaglia who died in May 1998; Joe Tartaglia who died in February 1994; Leo Tartaglia who died in 1985; and Pedro Tartaglia, who is living and is a plaintiff in this action.

**The Property**

{3} In 1957, the Tartaglia family moved into a home on Indian School Road in Albuquerque, New Mexico ("the Indian School property"). Title was placed in Joe's name. In 1966, this home was purchased by the Highway Department for the I–40 right of way. Romelia then purchased the property that is the subject of this action: a home on Eton Street, in Albuquerque, New Mexico ("the property" or "the Eton property"), title to which was placed in Joe's name. In May 1968, Joe executed a quitclaim deed to the property to Romi as grantee. The quitclaim deed was recorded in July 1969.

{4} In July 1981, Joe borrowed $10,000 from Albuquerque National Bank and signed a mortgage on the property. Although record title was in Romi's name, the mortgage contained Joe's representations that included the statements that "Borrower (Joe) is lawfully seised of the estate hereby conveyed and has the right to mortgage the property, the property is unencumbered." Joe was given a release of this mortgage in November 1986. In May 1993, Romi executed a special warranty deed to herself as trustee of a revocable living trust called the Romi Tartaglia Revocable Living Trust ("the trust").

{5} After 1966, subject to their ability to pay, Joe made monthly mortgage payments and paid the taxes and insurance on the property, and the remaining family members, while they lived on the property, paid for the property upkeep, repair, and the family living expenses.

**This Lawsuit**

{6} Pedro individually, and as personal representative of Joe's estate, filed a complaint in August 1996 to set aside Joe's 1968 quitclaim deed to Romi and Romi's 1993 special warranty deed, alleging as grounds Joe's incapacity and lack of intent to convey to Romi. Pedro is the "Appellee" here. The lawsuit named as Defendants the children of Romi, who are Karen Lynne Hodges and Albert John Meteney, Jr., and also named Hodges as successor trustee of the trust. These defendants are the "Appellants" in this opinion. Pedro also sought an express or resulting trust declaring Joe to have been the trustee of the property, and, in addition, to impose a constructive trust for the benefit of Joe's heirs, namely, himself, Carlos, Romi's children (Defendant Karen Lynne Hodges and Defendant Albert John Meteney, Jr.), and Leo, Jr.'s nephew (Leo III). Appellants counterclaimed to quiet title and added as parties to the counterclaim Leo III, and Connie Tartaglia, who was married to Leo, Jr.

{7} During the pendency of the present lawsuit, the property was sold and the sale proceeds were ordered placed in the registry of the court. The district court filed findings of fact and conclusions of law after a one-day bench trial. The court concluded that Romelia established an express trust in 1966 for the benefit of the family; that a resulting trust for the benefit of all members of the family arose from the 1966 deed in Joe's name; that Joe lacked intent to convey full title to Romi; and that the 1968 deed to Romi and Romi's 1993 deed to herself as trustee were wrongful, giving rise to constructive trusts and requiring the deeds to be set aside. The court then entered judgment: setting aside Joe's 1968 quitclaim deed to Romi and Romi's 1993 special warranty deed to herself as trustee; releasing the sale proceeds in the court registry to Pedro as the personal representative of Joe's estate to be distributed according to the laws of intestate succession; and dismissing the counterclaim with prejudice.

{8} The trial court primarily relied on the testimony of living witnesses reiterating statements of deceased persons to support its findings and conclusions regarding Joe's lack of intent and the existence of express, resulting, and constructive trusts. At the heart of the trial court's findings and judgment are statements attributed to Romelia, Joe, and Romi. It is the admission of those hearsay statements that constitutes the primary basis for Appellants' claim of error requiring reversal.

{9} The court admitted the hearsay statements under Rule 11–803(X) NMRA 2000 at trial. As Appellants correctly point out, the declarants were unavailable, so the appropriate catch-all rule is Rule 11–

804(B)(5) NMRA 2000, and not Rule 11–803(X). This point is inconsequential, however, because the two residual exceptions are identical. A point that is of significant importance to the resolution of this case on appeal is that although the court relied on one of the residual exceptions for admitting the statements at trial, it relied on another rule, Rule 11–804(B)(3), in its findings of fact and conclusions of law, to support the admission of some of the hearsay statements. We explain the significance of this point below.

{10} The court also ruled that Romi wrongfully paid herself $15,600 from Joe's bank account, and that Carlos's heirs were entitled to share in Joe's estate under the laws of intestate succession.

**This Appeal**

{11} Appellants seek reversal on several grounds. They attack the court's findings of fact regarding Joe's lack of intent to convey and regarding the trusts, on the ground that the findings are based on erroneously admitted hearsay evidence. They attack as unsupported by substantial evidence the court's findings of lack of intent and the existence of trusts. They assert error by the court in failing to apply the statute of limitations to bar the claim that Joe lacked intent to convey. They also attack as contrary to the law and evidence the determination that Romi wrongfully paid herself $15,600 from Joe's bank account, and the determination that Carlos's heirs could share in Joe's estate under the laws of intestate succession.

*The 1966 Eton Property Deed to Joe: Express and Resulting Trusts*

{12} The court found that Romelia intended in 1957 that the Indian School "home be used by all of the children who, in turn, would share the mortgage payments and upkeep expense as best they could." The court further found that Romelia placed title to the Indian School property in Joe's name because "he was the child who was most often living in the home." This trust, the court found, was intended to continue with the purchase of the Eton property in 1966 with the use of the Indian School property sale proceeds. Again, the court found, title to the Eton property was placed in Joe's name with the intent that he "hold and maintain the Eton home for the living use and benefit of the Tartaglia family." Implicit in this finding is that Romelia manifested her intent that Joe hold title for the benefit of the family. In addition, the court concluded that "[t]he Tartaglia family did not intend that Joe take the sole beneficial interest in the [Eton] property when the title ... was placed in his name."

{13} The court concluded that an express trust was established in 1966 by Romelia and her five children. The terms of that trust were that "Joe was to hold title to the property for the benefit of the Tartaglia family, which was a continuation of the express trust which had been established in 1957 with regard to the Indian School property." The court also concluded that because the family did not intend that Joe take the sole beneficial interest in the Eton property, "a resulting trust was created for the benefit of all members of the Tartaglia family" when Joe took title to the property. Thus, the court determined that, with respect to the 1966 Eton property deed, Romelia's manifest intent in placing title in Joe's name was solely for Joe to hold title for the use and benefit of the family and, further, that a resulting trust was created based on the family's intent that Joe not take the sole beneficial interest in the property.

{14} The court's findings were based on the testimony of Pedro, and of Pete Tartaglia, a cousin. Pedro testified that his mother, Romelia, told Joe, Leo, and Pedro after the Indian School property was purchased in 1957 that the property was being placed in Joe's name because Romelia knew she "wouldn't be living too long more," and because their father was sick. Romelia also told the boys that

she told Joe that this agreement was made to him because the house belonged to the whole boys, us, that were living in it, and that he would carry out her wishes.... [S]he said there's the house for us whenever, for us. It would never be sold until the last person would die, you know, and then it would be divided among the children, or whatever.

In addition, Pedro testified that, while the Eton property was being purchased, Romelia told Joe, Leo, and Pedro together that:

> [S]he couldn't put [the property] in all three names, that she was going to put it in one name, Joe. And she made him promise to her of her wish that this house belonged to us all, the brothers.... [I]t was there until the last person died; and then from there, they put the house to be sold and give them to the sons, if we was to get married...."

{15} Pedro also testified that, based on what he was told by Romelia, he knew that the money for the down payment on the Eton home came from the sale of the Indian School home. Yet, when asked whether it was also correct that the only basis for his knowledge of where the money came from to make the down payment on the Eton home is what his mother told him, Pedro testified, "No. I seen my mother handle the thing with Joe."

{16} Pete Tartaglia testified that right after Leo, Sr.'s death in 1963, Romelia (Pete's aunt) lived with Pete for two weeks and that Romelia told Pete, with regard to the ownership of the Indian School home, "the reason they had decided to do that was because they wanted to make sure that that house was there for everybody until the last member passed away, and Joe was around the most." Pete further testified that roughly two weeks to a month after Romelia died, Joe told Pete that "the previous arrangements that had been made by my aunt were in effect or were going to be carried out.... [T]he message was that the arrangement was still for them to live there until the last one passed away."

### The 1968 Eton Property Deed to

#### Romi: Constructive Trust

{17} The court found that Joe's quitclaim deed dated May 29, 1968, to Romi was "without any consideration whatsoever, and for the sole and single purpose of avoiding the loss and forfeiture of the family home on Eton to the bondsman." This finding was made along with findings regarding contemporaneous circumstances giving credence to Joe's purpose in executing a deed to Romi, namely, findings regarding Joe's two arrests, pledge of the Eton property for a bond, and execution of the deed to Romi "at a time when the bondsman was physically removing personal property from the Eton house to satisfy payment of the bond." The court also found that the delay in recording the deed until July 2, 1969, was further evidence of "Joe's lack of intent to convey to Romi in any manner other than to avoid the bondsman."

{18} The court concluded that the deed "constituted fraud, constructive fraud and a wrongful act" by both Joe and Romi, and the court imposed a constructive trust requiring that the deed be set aside, and that the property be reconveyed by Romi for the benefit of the Tartaglia family. At the same time, the court concluded that "Joe lacked the intent to convey the property to Romi," and "did not make a legal delivery" of the deed to Romi. Based on these holdings, the court imposed a constructive trust and required the reconveyance.

{19} The evidence to support the court's findings consists mainly of Pedro's testimony. Pedro testified that Joe said he (Joe) had signed the house as collateral for the bondsman in order for Joe and Pedro to get out of jail on bond. Joe told Pedro that they were "going to have to pay it back, otherwise they're going to try and take the house from us." Following this, Joe was worried, and Pedro and Joe did the second burglary. Pedro testified that, after the second burglary, Joe was again worried, was "acting real different," stopped eating, and "wasn't taking care of himself physically or mentally," and that Joe told Pedro that "[Joe] had signed the house as collateral, and [the bondsman] wanted their money, so they were going to try and get it some way."

{20} In addition, the court found that after 1968 "Joe, at various times, told Pedro, Carlos, Romi, Connie and Pete ... that the property was being held for the benefit of the Tartaglia family," and also that "Romi told Connie that the property was being held for the benefit of the Tartaglia family." The evidence to support these two findings consists of the testimony of Connie and Pedro. Connie, who moved in the Eton property in

1976 and left in 1980, testified that Romi and Carlos had some kind of a disagreement, that she (Connie) said to them, "Why don't you guys just go your own way? Why don't one of you move out or whatever . . . ," and that Romi said "because the house belonged to all of them, and they all had a right to be there." Connie also testified that around 1978, she inquired of Joe about who the house belonged to, and Joe told her, "that the house was in his name, but he did not own the house. It was in his name, but it belonged to everyone, you know, to all the boys, and for the reason that other people had mentioned, there was always a place for them to live. They never had to worry." Connie further testified that Joe said "[t]hat the house would be sold, and it would be divided up among the children, the surviving heirs." In addition, Connie testified that Leo had told her the same thing.

{21} Pedro testified that Albert Meteney came to Albuquerque and stayed a few months at the Eton property in the early 90s. Pedro testified that Romi and Albert were in the living room with Joe when Joe told Albert that if he was going to argue and fight he (Albert) could get his things and get out of the house. Pedro further testified that Albert then said, "Mom, I thought you said you owned the house;" that Joe said, "No. This house is ours. . . ." Pedro also testified that sometime before August 1993, Joe told Pedro that he (Joe) had Lou Gehrig's disease and that it was getting worse day by day. Pedro questioned what might then happen "to the house and everything," and Joe said that he was going to put the house in Pedro's and Carlos's names. According to Pedro, both Romi and Carlos were present during this conversation. He (Pedro) heard Romi and Joe arguing and guessed that Romi was upset and mad at Joe because Joe was going to put the house in Carlos's and Pedro's names, and Joe told Romi, "Why don't you go back to Missouri? This is our house." Pedro then testified that he did not hear Romi say anything in response about her owning or having a deed to the property. At the same time, Joe said, "[T]he house was supposed to be for the family, for us, and that was the place—we all had a place to stay, especially if we weren't married or

nothing." Pedro testified that Joe said, "[W]ell, the last survivor, he can sell the house and divide it among the sons. . . ."

{22} Further evidence from which the court inferred Joe's trustee status is that in 1981, some thirteen years after Joe's 1968 deed to Romi, Joe borrowed $10,000 from a bank and signed a mortgage on the property to secure the loan. The mortgage stated that "Borrower (Joe) is lawfully seised of the estate hereby conveyed and has the right to mortgage the property." Joe received a release of that mortgage in 1986.

*DISCUSSION*

## I. The Delicate Balance

{23} In addressing the issues surrounding the establishing of trusts based on the hearsay statements of deceased persons, we take note of words of caution of our Supreme Court:

> As a general rule, evidence of mere verbal admissions or statements of persons since dead, or of the alleged cestui que trust, or of mere loose expressions or admissions by the purchaser of property, such as that the purchase money was furnished by another, or that he was purchasing or holding for another, particularly after the death of such purchaser or a long lapse of time, and uncorroborated by other evidence, is insufficient to establish a resulting trust, as such evidence is most unsatisfactory, on account of the facility with which it may be fabricated, the impossibility of contradiction, and the consequences which the slightest mistake or failure of memory may produce.

*White v. Mayo*, 35 N.M. 430, 437, 299 P. 1068, 1071 (1931) (quotation marks and citation omitted). "[C]ourts typically view with suspicion claims to trusts based upon alleged oral agreements or understandings in cases where . . . the grantee is deceased." *In re Estate of McKim*, 111 N.M. 517, 521, 807 P.2d 215, 219 (1991).

{24} In the present case, Romelia, the settlor, and the person who allegedly directed the two deeds into Joe's name, is deceased. Lopez, the grantor of the 1966 Indi-

an School property deed to Joe, presumably is deceased. Joe, the grantee of the 1957 and 1966 deeds, and also the grantor of the 1968 deed to Romi, is deceased; Romi, the grantee of the deed from Joe, and also the grantor of the deed to herself as trustee, is deceased. Indeed, all of the children of Romelia are deceased except Pedro. Thirty years passed between Romelia's death and the filing of this action by Pedro. Twenty-eight years went by after Joe's deed to Romi.

{25} In addition, there exists no evidence that Joe deeded the property to Romi with any actual intent to defraud anyone in his family; rather, his intent appears to have been to defraud a creditor for the benefit of the family. There exists no evidence that Romi accepted the deed in order to defraud anyone in the family. No evidence exists explaining why this 1968 deed was not recorded until over a year after it was executed. Except perhaps for Pete, each person testifying in favor of the existence of trusts had a self-serving pecuniary interest. There exists no evidence, until lawsuits starting in 1995 between Carlos and Romi (or her children), that Joe or anyone else made any attempt to place title back in Joe; nor, apparently, did anyone bother to determine who held title.

{26} Unquestionably, these circumstances heighten suspicion of the validity of the claims of the Appellee in this case. And permeating this history is evidence that Joe was in and out of a mental institution—evidence actually offered by Appellee to show that Joe was not competent to execute the 1968 deed to Romi, a fact Appellee was unable to establish.

{27} Appellants, holders of legal title, were armed at trial with deeds valid on their faces, with established hearsay rules to keep out untrustworthy hearsay statements, with established standards of proof to require corroboration of evidence by interested persons, with related court determinations deciding similar issues in their favor, and with the protection of the high burden of proof required in order to impose an oral trust on property. Yet, Appellee was able to overcome these formidable barriers in the trial court. And it is Appellee who is now armed with his own formidable barriers. Those barriers include the standards of review that require this Court to review the court's admission of evidence for abuse of discretion. If we determine that the evidence was properly admitted, we view the evidence in a light most favorable to the decision below, we resolve all conflicts in the evidence in favor of that decision and to disregard evidence to the contrary, we defer to the trial court in regard to the weighing of conflicting evidence, and we indulge every presumption to sustain the judgment of the trial court. *See Insure New Mexico, LLC v. McGonigle,* 2000–NMCA–018, ¶¶ 7, 8, 128 N.M. 611, 995 P.2d 1053.

{28} This case certainly puts to the test the strength of the well-established statutory, procedural, and evidentiary safeguards against fraud when oral statements of dead people are relied on to establish oral trusts and overturn deeds. The trial court had before it several live witnesses whose credibility the trial court could weigh in determining whether the alleged statements were made or were being fabricated by the witnesses. We must evaluate the strength of the hearsay evidence that persuaded the court below to rule in Appellee's favor. We must also determine whether the trial court could have logically concluded that certain hearsay statements were admissible as statements against interest under Rule 11–804(B)(3) and whether sufficient circumstantial guarantees of trustworthiness exist under Rule 11–804(B)(5) to overcome the concerns about ambiguity, lack of candor, faulty memory, and misperception with respect to the other hearsay statements allowed in evidence. *See State v. Taylor,* 103 N.M. 189, 197, 704 P.2d 443, 451 (Ct.App.1985) (stating the dangers that the hearsay rule is designed to obviate). And, because Appellee's claims would fail without that evidence, we must, like the trial court, determine whether the danger of fraud can be obviated through an evaluation of all of the evidence in light of the concerns set forth in *White* and *McKim.*

{29} We tip the delicate balance in favor of the trial court's ruling admitting the hearsay testimony. We also hold that substantial evidence supported the court's determina-

tions of resulting and constructive trusts requiring a reconveyance of the property to Joe's estate for the benefit of Joe's heirs through intestate succession.

## II. The Court Did Not Abuse Its Discretion In Admitting the Hearsay Testimony

### A. *Initial Standards*

{30} At the outset, we deem it noteworthy that this was a bench trial, and the general rule pertaining to that type of trial appears to give a judge more flexibility in making admissibility determinations than in jury trials. *See State v. Hernandez*, 1999–NMCA–105, ¶ 22, 127 N.M. 769, 987 P.2d 1156 ("We presume that a judge is able to properly weigh the evidence, and thus the erroneous admission of evidence in a bench trial is harmless unless it appears that the judge must have relied upon the improper evidence in rendering a decision."). Thus, we view the trial court's actions from the perspective of its ultimate determination, and not from the perspective of what it particularly said in admitting items of evidence. Also, "[p]reliminary questions on the admissibility of evidence are determined by the trial judge[,]" and the trial judge need only be satisfied by a preponderance of the evidence that whatever preliminary facts are necessary to admissibility are established. *State v. Roybal*, 107 N.M. 309, 311, 756 P.2d 1204, 1206 (Ct.App.1988).

### B. *Appellee Gave Sufficient Notice to Appellants of the Statements*

{31} Appellants claim the trial court erroneously admitted the hearsay evidence because Appellee failed to inform them in advance of trial that he intended to offer the deceased declarants' statements into evidence. Appellee only had to give such notice for the statements offered under Rule 11–804(B)(5). Some of the deceased declarants' statements were properly offered and relied upon as statements against interest under Rule 11–804(B)(3), and these statements could be offered by Appellee without giving advance notice to Appellants. As to the hearsay statements offered, admitted, and relied upon solely under Rule 11–804(B)(5), we conclude that the trial court did not com-

mit reversible error, because although Appellants assert prejudice, they fail to explain how they suffered prejudice.

{32} To illustrate this point, we note that during the trial, when Appellants objected to the court's decision to admit Pedro's testimony regarding certain statements attributed to Romelia under Rule 11–804(B)(5), the court suggested that the trial be interrupted so that Pedro could be made available for a short mid-trial interview. Appellants accepted that procedure rather than a continuance of the trial. There was also a suggestion below that Appellants knew that Appellee's case would involve hearsay based on the depositions taken prior to trial. Appellants apparently felt comfortable enough with their mid-trial interview of Pedro to go on with the trial, notwithstanding Appellee's failure to strictly abide by Rule 11–804(B)(5)(c). After interviewing Pedro, Appellants made no further objection regarding lack of adequate pretrial information, and although Appellants continually either objected or relied on a continuing objection throughout the remainder of trial regarding hearsay testimony supplied by Pedro, Pete, and Connie, Appellants never again made a specific objection or complained about a lack of advance knowledge or fair notice of Appellee's intention to offer statements of deceased persons.

{33} Appellants could have taken the opportunity to demonstrate how they were prejudiced and could have demanded that the action be continued, pending compliance with the rule. And yet, they did none of those things. Rather, Appellants continued with the trial, made no attempt to demonstrate prejudice, and made no further objection about noncompliance under the rule. We do not see this as a basis upon which to reverse the trial court's admission of the hearsay evidence. *See Hartman v. Texaco Inc.*, 1997–NMCA–032, ¶ 25 n. 4, 123 N.M. 220, 937 P.2d 979 (ruling that an assertion of prejudice is not a showing of prejudice, and that in the absence of prejudice, there is no reversible error).

### C. *The Court Did Not Abuse Its Discretion In Admitting the Hearsay Statements*

{34} Appellants claim the court abused its discretion when it admitted the hearsay

statements because they do not fit within Rule 11–804(B)(5). Appellants argue that to be admissible under Rule 11–804(B)(5) the statements must be of a type that was not anticipated by the drafters of the rules. *See Wilson v. Leonard Tire Co.*, 90 N.M. 74, 77, 559 P.2d 1201, 1204 (Ct.App.1976). The statements, they say, cannot " 'almost, but not quite,' " fit a specific exception. *In re Esperanza M.*, 1998–NMCA–039, ¶ 26, 124 N.M. 735, 955 P.2d 204 (quoting *State v. Barela*, 97 N.M. 723, 726, 643 P.2d 287, 290 (Ct.App.1982)). Appellants claim the statements nearly, but do not, fit within the specific exceptions for statements against interest and family history.

{35} Appellants paint the court's rationale for admitting the hearsay statements with too broad a brush. Although the court relied on one of the residual exceptions for admitting the hearsay statements at trial, it employed another exception to justify its reliance upon some of those statements when it rendered judgment. In its findings and conclusions, the court stated that certain statements attributed to Joe and Romi were admissible under Rule 11–804(B)(3) as statements against interest. It is thus unduly limiting for us to assess the admissibility of every hearsay statement under Rule 11–804(B)(5).

{36} We believe that the trial court properly relied upon certain statements attributed to Romi and Joe by Connie and Pedro as statements against interest, notwithstanding the fact that it stated during the trial that it was admitting the statements under a different hearsay exception rule. In order to make this point, we will specifically identify the portions of Connie's and Pedro's testimony that the court relied upon under Rule 11–804(B)(3) to render its judgment and then explain why the trial court did not abuse its discretion by admitting that testimony. We also explain why the other hearsay testimony was properly admitted and relied upon under Rule 11–804(B)(5).

### 1. *Romi's Statements Against Her Interest*

{37} During the trial, Connie testified about a conversation where she, Romi, and Carlos were present. According to Connie, Carlos and Romi were arguing. Connie asked them, "Why don't you guys just go your own way? Why don't one of you move out or whatever?" In response, Romi stated that "the house belonged to all of them." For his part, Pedro testified about a conversation where he, Joe, Romi, and Romi's son, Albert Meteny, were present. According to Pedro, Joe told Albert that "he could get his things and get out of the house." Romi appears to have said nothing when Albert said to her, "Mom, I thought you said you owned the house," and Joe said "No, this house is ours."

{38} In our view, the trial court did not err by admitting and then relying upon this portion of Connie's and Pedro's testimony to render its decision because it could logically have concluded that Romi's statements were against her interest. The deed to the house was in Romi's name at the time these alleged conversations took place. She presumably would have had the power and authority to evict her siblings from the house had she so chosen. And yet, she elected to say, either through her express words or by her silence, that she effectively lacked the authority to unilaterally decide who remained in the house and who did not because the house belonged not only to her, but to her siblings as well. Romi's statements qualify as a statement against interest. *See State v. Gonzales*, 1999–NMSC–033, ¶ 9, 128 N.M. 44, 989 P.2d 419.

{39} Appellants argue that Romi's statements were really not against her interest because she was afraid of her brothers and she may therefore have refused to assert exclusive ownership of the house at the time the conversations took place so as not to upset Carlos and Joe. This determination was for the trial court to make. By making a specific finding that Romi's statement was against her interest, the trial court effectively rejected Appellants' argument that Romi made the statement because she was afraid of her brothers.

### 2. *Joe's Statement Against His Interest*

{40} Connie also testified that around 1978, she asked Joe who owned the

house. In response to her question, Joe stated "that the house was in his name, but he did not own the house. It was in his name, but it belonged to everyone, you know, to all the boys, and for the reason that other people had mentioned, there was always a place for them to live."

{41} In our view, the trial court did not err by admitting and then relying upon this portion of Connie's testimony. The deed to the house was in Romi's name at the time Joe made this statement; however, assuming that Joe genuinely believed that the house was in his name, it would have been against his interest to say that the "house belonged to everyone" for the same reason it was against Romi's interest to say the things that she said. Joe's statement qualifies as a statement against interest. *See Gonzales*, 128 N.M. 44, 989 P.2d 419, 1999–NMSC–033, ¶ 9.

### 3. *Other Statements*

{42} We also cannot say that the trial court abused its discretion in determining that the other hearsay statements fit within Rule 11–804(B)(5) and that the elements of that rule were met. The declarants are clearly unavailable. The statements are not covered in the specific exceptions. Nor do they almost, but not quite, fit a particular exception. The statements against interest we have previously held were properly admissible under Rule 11–805(B)(3); the statements at issue here are not statements concerning family history, such as adoption, marriage, or other relationship that is involved in Rule 11–805(B)(4).

{43} Further, the statements were offered as evidence of a material fact, namely, the intent of Romelia, Joe, and family members, in regard to the ownership of the property. The proponents of the statements apparently could procure no other evidence on the point. The statements were clearly probative and were more probative on the issue of intent than any other evidence. The record is completely silent with regard to any actions taken by Romi by which she openly asserted legal title to the exclusion of the other family members. Even in the face of that skepticism and caution with which we must review this type of case, we cannot say that the trial court must have concluded that the general purposes of the rules, as well as the interests of justice, were not best served by the admission of these other hearsay statements.

{44} Moreover, the testimony has a tenor of consistency both among the declarants and, more importantly, with the independent circumstances. The statements of family members, made in the presence of one another, concerning what to do with the family home under circumstances where the parents are elderly, some children are drug addicts and petty criminals, but live in the home, and where circumstances following the statements corroborate the statements themselves, appear to have the sort of trustworthiness contemplated by the drafters of the catch-all exception.

{45} In addition, the property was placed in Joe's name at a time that Romelia was ill, near death. The Indian School property had earlier been placed in Joe's name. The sale proceeds from the sale of the Indian School property were used to purchase the Eton property. Joe was incarcerated on a charge of burglary, and he pledged the Eton property to a bondsman for a bond. At the time Joe conveyed the property to Romi, the bondsman was pursuing the family assets, which were limited to the Eton property. Joe transferred the Eton property to the eldest sibling, Romi, for no consideration. For virtually all of the years following Romelia's death, more than one of the siblings resided on the property, and, depending on the availability of funds, each contributed to meet the various financial obligations required, to keeping title to the property, and to keeping the property habitable.

{46} The hearsay dangers identified in the *Taylor* case do not appear to be present in these circumstances. *See Taylor*, 103 N.M. at 197, 704 P.2d at 451. To the extent that one or more dangers were potentially present, we believe that there exist sufficient "guarantees of reliability inherent in the circumstances surrounding the making of the statement ... [and] indicia of reliability in that the event was corroborated by other

facts," *id.* at 198, 704 P.2d at 452, to permit the statements in evidence. In addition, the trial court was entitled to resolve preliminary questions of fact under *Roybal* such that a particular danger would be alleviated. *See Roybal,* 107 N.M. at 311, 756 P.2d at 1206. Finally, in this civil case, we are less concerned with the inappropriate use of corroborative evidence. *See State v. Pacheco,* 110 N.M. 599, 602–03, 798 P.2d 200, 203–04 (Ct. App.1990) (noting that other jurisdictions consider the presence of corroborating circumstances relevant in evaluating admissibility under the catch-all exception, but that doing so would be problematic in a criminal case in which confrontation is a concern).

{47} We can see how the trial court could logically determine that the " 'declarant[s'] truthfulness [was] so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.' " *United States v. Tome,* 61 F.3d 1446, 1452 (10th Cir.1995) (quoting *Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)). We can further see how the trial court could determine that the declarants were " 'particularly likely to be telling the truth when the statement was made.' " *Tome,* 61 F.3d at 1453 (quoting *Wright,* 497 U.S. at 822, 110 S.Ct. 3139)). And we can understand how the district court saw the evidence in a light that favored its admissibility. We do not believe that we have interpreted the residual exception in a way which can be considered a broadening of that exception with commensurate concern that the exception might eventually "swallow the entirety of the hearsay rule." *Id.,* 61 F.3d at 1452. We hold that, under the unique circumstances of this case, the court did not err in admitting the hearsay statements under Rule 11–804(B)(3) and Rule 11–804(B)(5).

## III. The Court's Determinations Regarding Lack of Intent and Creation of Trusts Are Supported by Substantial Evidence

{48} Appellants next contend that the court erred in determining that Joe lacked intent to convey title, and in determining that express, implied, and constructive trusts were created. We address these contentions considering the admitted hearsay statements of the deceased declarants.

### A. Lack of Intent

#### 1. Statute of Limitation

{49} Appellants attack the determination that Joe lacked intent to transfer the property to Romi on the ground that the claim to set aside the deed to Romi belonged solely to Pedro as personal representative of Joe's estate, and that the claim was barred by NMSA 1978, § 37–1–4 (1880). Specifically, Appellants argue that Joe signed the deed on May 29, 1968, and Joe's claim to void the deed was barred as of May 29, 1972, more than twenty-four years before the present lawsuit was filed.

{50} Appellee counters that Joe committed conversion of the property when he deeded it to Romi without intent to convey and that the action for conversion did not accrue until Pedro and Carlos discovered in 1995 that Romi deeded the property in 1993 to herself as trustee. Appellee cites NMSA 1978, § 37–1–7 (1880) ("In actions for ... conversion of property, the cause of action shall not be deemed to have accrued until the ... conversion ... shall have been discovered by the party aggrieved.").

{51} The trial court sidestepped the contentions of both Appellants and Appellee. Using a different tack, and based presumably on the idea that that issue need be addressed only in regard to the claims seeking to establish trusts, the court concluded that the cause of action for constructive trusts did not accrue until after June 23, 1995, when Romi's children filed their counterclaim against Carlos in the collateral litigation between Romi's children and Carlos.

{52} While the court ruled both that Joe lacked intent to convey and that Joe's transfer was wrongful requiring the imposition of a constructive trust, the court addressed the statute of limitations issue only in regard to the claim for constructive trust and did not address Appellants' argument that the statute of limitations barred the estate's claim of lack of intent to convey. Appellants do not argue that the statute of limitations bars

either the estate's or Pedro's claim regarding a constructive trust. Indeed, Appellants say in their reply brief that "the statute of limitations has expired only on the claims regarding lack of intent to transfer the property and not on the trust issues." We need not address whether Appellants' statute-of-limitations defense to the claim regarding Joe's lack of intent has merit. Even were we to hold in Appellants' favor, the determination would not change any result, since we hold that the court did not err in determining that trusts arose that require the deeds to Romi individually and as trustee to be invalidated and the property to be reconveyed.

### 2. Substantial Evidence

{53} Appellants attack the determination that Joe lacked intent to transfer legal and beneficial title to the property to Romi on the grounds that the deed was valid on its face and that Joe's intent is unknown.

{54} Joe's intent is material on the issue whether trusts were created or imposed. The trial court was not persuaded, as Appellants contend, that Joe "intended to part with control and dominion over the land irretrievably." *Den–Gar Enters. v. Romero*, 94 N.M. 425, 428, 611 P.2d 1119, 1122 (Ct. App.1980). In this case, it is obvious that the court inferred lack of intent to transfer full title to Romi when it determined that the transfer was without consideration, was made under circumstances compelling a conclusion that the transfer was simply a tactic to escape the clutches of the bondsman who was collecting on the bond obligation, and was made while the property was the subject of express and resulting trusts formed two years earlier. Furthermore, Joe later borrowed $10,000 from a bank and mortgaged the property. These determinations provide substantial evidence from which the court could reasonably infer a lack of intent to convey full legal title to Romi.

### B. Creation and Imposition of Trusts

{55} The court determined that an express trust was established, a resulting trust was created, and constructive trusts were imposed, with regard to the property. The trusts are all to the same effect: the property was to be held by a family member for the benefit of the Tartaglia family.

{56} Appellants contend that Appellee did not meet the high proof threshold that must be met in order to establish oral or implied trusts. They point out that, whether constructive or resulting, these two forms of implied trusts can be proved only by clear, cogent, and convincing evidence. *See Bassett v. Bassett*, 110 N.M. 559, 563, 798 P.2d 160, 164 (1990). *But see McKim*, 111 N.M. at 519, 807 P.2d at 217 (questioning the use of this proof burden when seeking restitutionary remedies to prevent unjust enrichment under circumstances not involving fraud or other wrongful conduct).

{57} In reviewing the district court's findings regarding the trusts, "we reverse only if convinced that, viewing the evidence in the light most favorable to the prevailing party, the findings cannot be sustained by the evidence or permissible inferences therefrom." *McKim* at 519–20, 807 P.2d at 217–18. "Even where the standard of proof is clear and convincing evidence, it is for the factfinder and not the appellate courts to weigh conflicting evidence and arrive at the truth." *Bassett*, 110 N.M. at 563, 798 P.2d at 164.

{58} An express trust is one that is created by the manifest intention of the settlor to create it. *See Aragon v. Rio Costilla Coop. Livestock Ass'n*, 112 N.M. 152, 154–55, 812 P.2d 1300, 1302–03 (1991). An express trust must pass statute of frauds muster. *See id.* at 155, 812 P.2d at 1303. Some memorandum manifesting and proving the trust must exist. *See id.* No such memorandum exists in the case before us. Therefore, the trust that Romelia intended to create failed as an express trust.

{59} A resulting trust, however, can result from a failed express trust. *See id.* "[A] resulting trust arises where circumstances raise an inference that the settlor does not intend that the person taking or holding title shall have the beneficial interest." *Id.* The court determined that "[t]he Tartaglia family did not intend that Joe take the sole beneficial interest in the property when the title to the property was placed in

his name." The evidence and findings support this determination, and the court's conclusion that, as a result, "a resulting trust was created for the benefit of all members of the Tartaglia family" is not erroneous.

■ {60} A constructive trust "is imposed to prevent the unjust enrichment that would result if the person having the property were permitted to retain it." *Id.* at 156, 812 P.2d at 1304. The circumstances where a court might impose a constructive trust may involve actual or constructive fraud, duress, undue influence, abuse of a confidence, breach of a fiduciary duty, "or similar wrongful conduct." *Id.* More generally, such a trust can be imposed based upon the "breach of any legal or equitable duty," or the "commission of a wrong." *Id.* at 157, 812 P.2d at 1305.

■ {61} In the present case, the court determined that "[t]he execution of the Quitclaim Deed, dated May 29, 1968, from Joe to Romi constituted fraud, constructive fraud and a wrongful act by Joe and Romi against the remaining members of the Tartaglia family." The court determined the same regarding Romi's deed to herself as trustee. Presumably, these determinations, which led the court to further conclude that this conduct "imposed a constructive trust" requiring the deeds to be set aside, were based on the circumstances surrounding the execution of the deed to Romi (namely, escaping the bondsman), the lack of consideration for that deed, the failure to record the deed for over a year, and the history from 1957 to 1968 during which Romelia and Joe acted with the intent that a trust for the benefit of the family be created. This evidence and the court's related findings support the court's determination of imposition of a constructive trust. Once the premise of a trust for the benefit of the family was established, the court could reasonably conclude that Joe acted wrongfully in deeding the property to Romi and then in not assuring that the property was deeded back and that Romi acted wrongfully in asserting title to the exclusion of the family. As the trial court concluded, a breach of this trust for and among family members may be considered a breach by Joe and Romi of a duty upon which a constructive trust could properly be imposed.

## IV. The Court's Conclusion of Law Regarding Check on Joe's Account Is Harmless Even If Erroneous

{62} Romi wrote out and signed a check payable to herself dated September 22, 1993, drawn on Joe's checking account, for $15,600. The check was signed, "Joseph Tartaglia, by Romi Meteney, POA," and stated that it was for "Repayment of Loan." The court did not enter a finding of fact specifically regarding this check. The court did, however, enter the following conclusion of law:

The payment by Romi to herself of $15,600 from Joe's Credit Union account was made without a power of attorney from Joe and without proof of a loan for $15,600 from Romi to Joe and removed available funds for the mortgage, insurance and upkeep of the property and was wrongful.

The court's judgment does not grant any relief with respect to this specific circumstance.

{63} Appellants attack the court's conclusion of law on several grounds, yet show us no connection between this conclusion and any relief granted by the court. And the court did not award any amount of money against any party in this action based on this check. We are not informed by Appellants of any future significance the conclusion might have.

{64} Further, the record fails to show any claim for damages or specific mention of a right to relief in regard to this check. Neither party has pointed us to any testimony regarding the check. All we have is the check itself and the testimony that Romi told Pete that she had a power of attorney. The first mention by Appellee of a "wrongful" transfer appears in Appellee's amended requested conclusions of law. Indeed, the court's letter "Decision" in which the court summarizes its findings and rulings and requests the final drafts of requested findings of fact and conclusions of law, does not mention the check or anything that would indicate that this issue was significant in any regard.

{65} The court's conclusion is a rebel without a cause. Even were it erroneous, it is not necessary to the court's decision, and it is not a basis for reversal. *See Corlett v. Smith,* 107 N.M. 707, 711, 763 P.2d 1172, 1176 (Ct.App.1988). We, therefore, need not address the various arguments regarding whether the conclusion was correct.

## V. The Court's Inclusion of Carlos's Heirs Was Not Erroneous

{66} Before his death in 1998, Carlos unsuccessfully sought to intervene in the lawsuit. In denying Carlos intervention in the present case, the district court concluded that Carlos's claims were adjudicated or could have been adjudicated in a prior lawsuit, that the claims he sought to assert in the present action were barred by res judicata, and that Carlos had no interest in the property. However, after trial, the court determined that Carlos's heirs were entitled to share in the property along with all of Joe's heirs. Specifically, the court found that "Carlos was a beneficiary of the express trust established in 1966 for the benefit of the Tartaglia family; as a beneficiary of said trust, Carlos's heirs are entitled to share in Joe's estate under the laws of intestate succession."

{67} Appellants attack this finding as a determination of heirship that the court had no jurisdiction to decide. Appellants point to a separate, pending action, commenced in the Second Judicial District Court in June 1996, three months before the present action was filed, in which Pedro applied for "Informal Appointment of Personal Representative" in an unsupervised administration. The day after Pedro's application was filed, he was informally appointed personal representative of Joe's estate in an unsupervised administration. The record contains no documents filed in that informal proceeding other than Pedro's application and the order that appoints him as the personal representative. It would appear that Pedro's intent in filing the application and obtaining informal appointment was to file the present action as the personal representative of Joe's estate. Indeed, the complaint in the present action alleges that appointment. The answer states no defense attacking Pedro's right to sue or the court's authority to entertain the action.

{68} Appellants argue that the issue of heirship should be determined in a separate action. Appellants further argue that, in the present case, the procedures required in the New Mexico Probate Code, NMSA 1978, §§ 45-3-101 to -1302 (1975, as amended through 1995), for the establishment of heirship were not followed, placing the issue "beyond the Court's authority." Other than their general cite to the Probate Code, Appellants cite to no specific Probate Code provision or other authority for their position that the trial court had no jurisdiction or authority to determine that Carlos's heirs had the right under the trust to share in Joe's estate. Nor do Appellants show us where below they objected to or sought dismissal of the present action on the ground that the district court in the present case lacked jurisdiction or authority to entertain the relief sought by Pedro as the personal representative of Joe's estate.

{69} The Probate Code permits a personal representative to administer and distribute the estate, maintain actions to recover possession of or to determine title to property, and to prosecute claims for the protection of the estate. *See* §§ 45-3-703(D), -709, -715(A)(22). Once appointed as the personal representative of Joe's estate, Pedro was exercising his right, if not his duty, in bringing this action. The district court clearly has jurisdiction to hear the issues at hand. *See* NMSA 1978, § 45-1-302 (1978). The only question is whether the same district court can entertain the informal probate proceeding in one docketed action and, in a separate docketed action to recover property, determine that the heirs of Joe's brother Carlos are entitled to share by intestate succession, along with Joe's other siblings or their heirs, in the proceeds from the sale of the property. This is not a jurisdiction issue.

{70} Appellants next attack the court's finding on the ground that the trial court erred in granting relief to Carlos or Carlos's heirs because Carlos is not a party to this action. Carlos, they point out, actually sought and was denied intervention, and this

denial was upheld in an earlier appeal. Appellants argue that both the trial and appellate courts found that Carlos had no interest in the property and that his claims were barred by res judicata, becoming the law of the case binding the trial court.

 {71} In pressing their res judicata and law of the case contentions, however, Appellants ignore the express language of this Court's opinion upholding the denial of Carlos's intervention. We said that, to the extent that a count of the complaint in this case concerned "the declaring of a trust holding the property for the heirs of Joe Tartaglia[,] ... Carlos could not have raised this matter in any of his previous lawsuits." We also said that intervention was properly denied because Carlos's interest as an heir would be protected by Pedro on behalf of the estate. Thus, we do not need to resort to the "discretionary and flexible" aspects of the doctrine of law of the case. *See Trujillo v. City of Albuquerque,* 1998–NMSC–031, ¶¶ 41–42, 125 N.M. 721, 965 P.2d 305 (holding that the doctrine of law of the case is discretionary and flexible).

 {72} Our prior holding expressly did not foreclose the relief sought here. In addition, our prior holding raises considerable doubt about whether the issues in this case could have been raised by Carlos before, and Appellants' briefs have not shown us how res judicata would apply with reference to any facts, such as the records of the prior suits, other than the trial court's order denying intervention in this case and our opinion upholding that order on appeal. *See Griffin v. Guadalupe Med. Ctr., Inc.,* 1997–NMCA–012, ¶ 20, 123 N.M. 60, 933 P.2d 859 (holding that briefs need to provide references to the evidence and that this Court will not search the record to find facts to overturn a trial court's decision).

{73} The trial court reasonably determined that because the title is to be returned to Joe's estate in trust for the family, Carlos, along with other family members, has a right to share in the proceeds from the sale of the property. All family members were intended beneficiaries. The court obviously determined that the reasonable and equitable result was to include Carlos's heirs with all of the other family members. We cannot quarrel with the result. We hold that the court did not err in including Carlos's heirs.

## CONCLUSION

{74} The court did not err in finding the existence of a resulting trust and imposing a constructive trust on the property that required the reconveyance of the property for the benefit of Joe's heirs through intestate succession. We affirm those determinations.

{75} **IT IS SO ORDERED.**

PICKARD, C.J., and BOSSON, J., concur.