2005-NMCA-026

108 P.3d 543

**STATE of New Mexico ex rel. CHILDREN, YOUTH and FAMILIES DEPARTMENT, Petitioner–Appellee,**

v.

**FRANK G. and Pamela G. Respondents–Appellants.**

**In the Matter of P.A.G., Child.**

**Nos. 23,497, 23,787.**

Court of Appeals of New Mexico.

Dec. 17, 2004.

Certiorari Granted, No. 29,042, Feb. 21, 2005.

Angela L. Adams, Chief Children's Court
Attorney, Rebecca J. Liggett, Children's

Court Attorney, New Mexico Children, Youth and Families Department, Santa Fe, for Appellee.

Jane Bloom Yohalem, Santa Fe, for Appellant Frank G.

Nancy Simmons, Law Offices of Nancy L. Simmons, PC, Albuquerque, for Appellant Pamela G.

Colene Flynn Robinson, Denver, CO, for Amicus Curiae National Association of Counsel for Children.

*OPINION*

ROBINSON, J.

{1} Parents Frank G. (Father) and Pamela G. (Mother) appeal from an adjudication by the children's court finding child abuse and neglect of their three-year-old adopted daughter/natural granddaughter (the Child). In an Amended Neglect/Abuse Petition, the Children, Youth and Families Department (CYFD) alleged that Father had sexually abused the Child and that Mother had failed to protect her from that abuse. The children's court found by clear and convincing evidence that the Child was an abused and neglected child as defined in NMSA 1978, § 32A–4–2(B)(3) and (4) (1999) and NMSA 1978, § 32A–4–2(E)(3) (1999). On appeal, Father and Mother contend that the children's court erred when it admitted hearsay statements made by the Child regarding the sexual abuse. We affirm the judgment of the children's court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{2} Initially, CYFD took the Child into physical custody because of the living conditions in Parents' home. A neglect and abuse petition was filed in November 2001, alleging that the Child lived in an "unsafe, unsanitary, and uninhabitable home." The petition stated that the home contained no food, that it was filthy throughout, and that fifteen to twenty dogs and cats lived in the home, resulting in a strong odor of feces and urine. The Child's hair was dirty and badly matted. Her body and clothing were described as being filthy and having the same strong odor as the home.

{3} After a custody hearing in December 2001, the children's court placed legal custody of the Child with CYFD and ordered an evaluation of the four-year-old Child. Parents were represented by their individual attorneys and the Child by a guardian ad litem. Parents were granted visitation with the Child and ordered to undergo psychological, parenting, and substance abuse assessments. An adjudicatory hearing was held in January 2002, and Parents entered pleas of no contest to the allegations of the abuse and neglect petition. In the stipulated judgment and disposition, the children's court found that the Child was abused and neglected, under Section 32A–4–2(B)(4) and Section 32A–4–2(E)(2), and adopted CYFD's treatment plan. The court ordered that legal custody of the Child should remain with CYFD for a period up to two years and that Parents should participate fully in the treatment plan. Parents do not contest the stipulated judgment and disposition which found the Child to be abused and neglected because of the unsafe and unsanitary condition of Parents' home. Rather, they challenge only the adjudication on the amended abuse and neglect petition resulting from the allegations of sexual abuse.

{4} The Child was placed in a foster home in January 2002. On March 8, 2002, she told her foster mother about an occurrence of sexual abuse involving Father. The foster mother immediately reported the disclosure to the CYFD social worker assigned to the Child's case. The social worker came to the home that same day and interviewed the Child. Based on that interview, in which the Child told the social worker about the sexual abuse, the social worker arranged for an interview with a clinical forensic interviewer at the Children's Safe House at All Faiths Receiving Home in Albuquerque, New Mexico, an agency specializing in the treatment of families affected by sexual abuse. In April 2002, the Child had a physical examination with Dr. Ornelas at Para Los Niños. Dr. Ornelas reported a normal vaginal exam but had concerns about anal penetration; her findings were non-specific. The doctor prescribed an oral antibiotic for the treatment of an anal infection. Subsequently, in April

2002, an amended abuse and neglect petition was filed to include the allegations that Father had sexually abused the Child and that Mother had failed to protect her from that abuse. The Child was referred to a program therapist at All Faiths Receiving Home for diagnosis and for therapy.

{5} An adjudication hearing on the new allegations was set for June 2002, and in May 2002, CYFD filed a notice of its intent to offer the Child's statements to the foster mother, the CYFD social worker, the Safe House interviewer, and the All Faiths program therapist as exceptions to the hearsay rule. The notice did not indicate which exceptions to the hearsay rule CYFD would be relying upon, but Rule 11–803(X) NMRA 2004 and Rule 11–804(B)(5) NMRA 2004, the two catchall exceptions to the hearsay rule, require prior notice to an adverse party. *See* Rule 11–803(X)(3); Rule 11–804(B)(5)(c). In response, Father filed a motion in limine to exclude the hearsay statements. He contended that any statements by a "non-competent minor child" would lack the "equivalent circumstantial guarantees of trustworthiness" required by the catchall hearsay exceptions of Rule 11–803(X) and Rule 1–804(B)(5) and would also deny Father his right, under the United States and New Mexico Constitutions, to confront the witnesses against him. Mother concurred in the motion.

{6} At the adjudicatory hearing in June 2002, the children's court reviewed the motion in limine and heard argument of counsel regarding the admissibility of the Child's statements. The children's court ruled that the Child's statements about the sexual abuse would be admitted conditionally, stating to Parents that it would be mindful of their objections as it weighed the credibility of the statements. In opening remarks, both Parents objected to the admission of the statements on the basis of hearsay, the Child's competency as a witness, and the confrontation clause. CYFD presented testimony from the Child's foster mother, the social worker from CYFD, the interviewer from the Children's Safe House, and the program therapist from All Faiths about the Child's hearsay statements concerning sexual abuse. Parents did not testify at the hearing

or offer any witnesses, other than recalling the CYFD social worker to testify.

{7} The foster mother, a retired registered nurse, testified that the Child had come to her home in January 2002. When she arrived, the foster mother had gone over some house rules with the Child. Among those rules was the importance of telling the truth, including a discussion of the difference between truth and lies. The foster mother testified that she believed the Child understood the difference between truth and lies and also understood that the consequences in the foster home for lying would be a time-out. The foster mother stated that she had never had a reason to put the Child in a time-out for lying. She also described some behaviors the Child had exhibited when she came to live in the foster home that concerned the foster mother. In the beginning, the Child would attempt to kiss the foster parents with her mouth open and also attempt to thrust her tongue into their mouths at the same time. When the foster parents objected, the Child said, "That's how we kiss at home," and also stated that was how she kissed Mother. Additionally, when she first came to their home, the Child would perform a song and dance which she called her "Oh, I'm so sexy, oh, I'm so cute" dance. The Child told the foster mother that Father had taught her the dance. The foster mother testified that one morning, while the Child was taking a bath with the foster mother in the room, the Child began to sing "I'm so sexy, I'm so cute" and began "sticking a washcloth up her bottom." When the foster mother asked her what she was doing, the Child responded, "I'm sexing myself." The foster mother asked her who had told her about that. When the Child replied, "My Dad," the foster mother clarified that the Child was referring to Father and not to the foster father. The foster mother testified that the Child had explained her behavior with the washcloth by saying, "This is the way [Mother] and [Father] have sex-[Father] sexes [Mother] back here," pointing to her anus. The Child then opened her legs, pointed to her vaginal area, and said, "[Father] sexes [Mother] here too." The foster mother said that the Child went on to say, "And when [Father] was sexing me, I tried to push

him off because he was too heavy, and I kept saying 'No! No!', but he wouldn't get off and I couldn't push him off." The foster mother testified that she then told the Child that "Mommies and Daddies don't touch their kids down there," to which the Child responded "Yes, they do." After the foster mother told her husband what the Child had said, the foster parents called CYFD, and the CYFD social worker came to their home. At the adjudicatory hearing, the foster mother also described a number of other disturbing behaviors exhibited by the Child, which included being short-tempered and easily frustrated, tantrums, hitting, and a number of sexualized behaviors. The sexualized behaviors included frequent masturbating with her hand, with her dolls and stuffed animals, and with the family dog. The Child would masturbate openly in front of her foster parents as well as in front of strangers. She also engaged in aggressive play with her dolls as well as simulating acts of sexual intercourse between the dolls.

{8} The CYFD social worker came to the foster home on the same day that the Child told the foster mother about being "sexed" by Father. She talked to the Child in the privacy of the Child's room in the context of playing with the Child and her toys. The social worker testified that she had been trained in how to interview children and stated that she had asked open-ended questions which were not leading or suggestive when she talked to the Child about the sexual allegations. She testified that before talking to children about any allegations, it was a standard procedure on her part to discuss the difference between truth and lies with them. She stated that she had done so with the Child and was satisfied that she understood the difference and knew that "a lie is something that hasn't happened, the truth has happened." The social worker asked the Child what she had talked to the foster mother about during the bath. The Child said that she had told the foster mother about Father having "sexed" her and that Father had gotten on top of her but he was too big for her to push off. The Child told her that this had happened in Parents' bedroom. The Child said that Mother was in the room and told her "to get out, or get off, and pull up

her pants." The social worker testified that the Child had told her that "Father had poked her 'wee-wee' with his 'wee-wee." When the social worker asked her what a "wee-wee" was, the Child pointed to her vaginal area. The social worker testified that, based on her experience, the sexualized behavior exhibited by the Child was atypical for a child her age but it was consistent with victims of sexual abuse. The CYFD social worker described the Child's narration as having been matter-of-fact and that she considered the Child to be fairly verbal for her age. She stated that all the Child's disclosures about the sexual abuse had been consistent as to the location (Parents' home), the parties present (Father and Mother), and the events that occurred.

{9} The CYFD social worker was questioned by Parents about a psychological evaluation prepared for CYFD in January 2002 shortly after the Child was taken into custody. She was asked about the following statement from the evaluation: "While there are no indicators of outright physical or sexual abuse, it does appear that [the Child] grew up in an environment where basic cleanliness, self-respect, and adequate attention were lacking." The social worker responded that the psychologist who prepared the evaluation had not been asked by CYFD to undertake a sexual abuse evaluation of the Child and he had not done so. Parents did not seek to introduce the evaluation into evidence, and the psychologist was not called to testify.

{10} Within two weeks of the initial report of sexual abuse, the Child was taken to the All Faiths Children's Safe House where she was interviewed by a clinical forensic interviewer. The interviewer stated that her job at the Safe House was to interview children and developmentally delayed adults when sexual or physical abuse was suspected. She testified that the interview with the Child was videotaped and that she had explained to the Child that it would be videotaped. The interviewer stated that she was enrolled in a master's degree program and had received extensive on-the-job training in interviewing techniques, particularly with regard to interviewing children. The video-

tape of the interview was introduced into evidence and played at the adjudicatory hearing. On the videotape, the Child again made a number of unsolicited disclosures to the interviewer about sexual abuse by Father occurring in Parents' home. She stated that Father had "poked" her "wee-wee" (again pointing to her genital area) on the skin and her "butt" (pointing to the area between her buttocks) with his "wee-wee" which she described as "a thing that was sticking out" (gesturing outward from the genital area). At two different points in the interview, the Child stated that Mother was in the room and saw Father on top of her. The Child said that Mother told her to "get off," which she finally was able to do, and that she then pulled up her pants. When asked if Father touched anyone else, the Child responded that when she slept with Parents in their bed, she saw them "fucking." She said that Father used the word "fucking" to describe what he and Mother did and also what he and the Child did.

{11} Because of the Child's emotional and behavioral problems, she was referred to a program therapist at All Faiths for an assessment as well as diagnosis and treatment. The program therapist testified at the adjudicatory hearing. She stated that she had a Master's degree in counseling and clinical social work and continues to receive specialized training under a continuing education program. She is licensed by the state as a master social worker, as defined in NMSA 1978, § 61–31–3(H) (1989). As a licensed master social worker, her scope of practice consists of "assessment, diagnosis and treatment, including psychotherapy and counseling." *See* NMSA 1978, § 61–31–6(B)(1) (1996). She testified that she is qualified to diagnose and provide treatment to children and families under the licensing statute. During her two years of employment at All Faiths Receiving Home, she has provided therapy to many parents and children referred to All Faiths because of child abuse and neglect. In the course of treating families, the therapist testified that she had made recommendations about visitation and the potential for reunification. The therapist was then offered as an expert and qualified by the children's court as an expert on treat-

ment. She stated that in providing therapy to victims of sexual abuse, it was essential for her to know the identity of the perpetrator. This knowledge was necessary, she stated, in order to diagnose and treat the emotional impact of the sexual assault because the treatment for intrafamilial child abuse differs from treatment for abuse by a stranger. In her experience, children who have been abused by family members or other caregivers tend to internalize responsibility for the abuse and also need help in dealing with the consequences of disclosing abuse.

{12} The All Faiths program therapist stated that, at the time of the adjudicatory hearing, she had met with the Child for seven counseling sessions. She testified that she had explained to the Child what therapists do and that they would be talking to help the Child deal with her feelings. She testified that she did not ask the Child about the sexual abuse but instead waited for the Child to raise it on her own. At the initial meeting with the foster parents and the Child, the foster parents had told the program therapist, in the Child's presence, about the Child's disclosures while in the bathtub and about the Child's masturbation. During this meeting, the Child also stated that Father had put his "wee" next to her "wee," pointing to her genital area, and then added that when Father got off her, she had seen his "wee." The All Faiths therapist described a later counseling session when just she and the Child were present. In the context of making cookies with clay, the Child had mentioned her Mother. When the therapist asked the Child to tell her about her family, the Child responded, "I don't like it when [Father] fucks me" and that it made Mother mad when he did that. The program therapist testified that the Child's statement had been made spontaneously and was consistent with the Child's earlier statement to her about sexual abuse by Father.

{13} The All Faiths program therapist also described the Child's behavioral difficulties, including the sexualized behavior which she said would typically be a learned activity in a four-year-old child. These behaviors included masturbation with toys, enactment of sexual activity with toys and stuffed ani-

mals, as well as low tolerance to frustration and aggressive behavior that included throwing things and hitting. The Child also suffered from nightmares and sleep disturbances. The therapist testified that, in her opinion, these behaviors were consistent with Post Traumatic Stress Disorder (PTSD): a traumatic event, sexual abuse in this case; re-experiencing the event through masturbation, sexual play with her toys, and nightmares; avoidance of the trauma shown by the Child's reluctance to talk about the event for any extended period; her distractibility; and her anger. The program therapist testified that it was not her role to evaluate the allegations of sexual abuse or to assess the credibility of the Child. She did state that in diagnosing and treating the Child, she does observe whether what the Child is telling her about the sexual abuse is consistent with what she has told others. The program therapist testified that the Child's statements to her had been consistent with the other statements and also consistent with the behaviors the Child was exhibiting.

{14} When asked her opinion as to whether the Child could testify about the abuse in a courtroom under oath, the program therapist responded that it would not be an appropriate setting for a Child that age and would be harmful to the Child's therapy. She stated that being asked to come into a courtroom and answer the questions of strangers would heighten the Child's anxiety. The therapist noted that the Child already had a tendency to be avoidant about the abuse, a characteristic consistent with PTSD. Being asked questions about the abuse by strangers would only increase the stress and anxiety experienced by the Child in discussing the abuse and might lead to an unwillingness on the part of the Child to discuss her feelings about it at all. When asked whether it would be likely that the Child would talk if she was brought into the courtroom with the attorneys and Parents present, the program therapist replied, "No."

{15} At the conclusion of the adjudicatory hearing, CYFD offered the admission of all the testimony under Rule 11–803(X), and also offered the All Faiths therapist's testimony under Rule 11–803(D). The children's court determined that the Child's statements were sufficiently reliable to be admissible as exceptions to the hearsay rule and denied Father's motion in limine. The court then concluded that there was clear and convincing evidence that the Child was an abused and neglected child under Section 32A–4–2(B)(3) and (4) and Section 32A–4–(E)(3), as alleged in the amended petition. *See* NMSA 1978, § 32A–4–20(H) (1999) (requiring clear and convincing evidence to support a finding of neglect and abuse).

## II. DISCUSSION

{16} Parents challenge the admission of the Child's hearsay statements concerning sexual abuse, contending that all the statements were inadmissible hearsay. They contend that the statements do not fit any hearsay exceptions. They also assert that the improper admission violated their rights to due process in that it denied them the opportunity to confront the witness against them. Although hearsay testimony is generally inadmissible, *see* Rule 11–802 NMRA 2004, our Rules of Evidence include a number of exceptions to the hearsay prohibition. *See* Rule 11–803; Rule 11–804. CYFD offered the Child's hearsay statements under Rule 11–803(X), the catchall exception, and argued that the testimony by the All Faiths program therapist was also admissible under Rule 11–803(D), the exception for statements for medical diagnosis or treatment.

■ {17} The admission of evidence as an exception to the hearsay rule is reviewed under an abuse of discretion standard. *In re Esperanza M.*, 1998–NMCA–039, ¶ 7, 124 N.M. 735, 955 P.2d 204; *accord State v. Massengill*, 2003–NMCA–024, ¶ 11, 133 N.M. 263, 62 P.3d 354 (stating, with regard to hearsay admitted under a catchall exception, that "[t]he trial court's ruling concerning the trustworthiness of an out-of-court statement will be upheld unless there has been an abuse of discretion") (alteration in original) (quoted authority and quotation marks omitted). Constitutional claims are reviewed de novo. *State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003–NMSC–015, ¶ 17, 133 N.M. 827, 70 P.3d 1266.

## A. Rule 11–803(X): Other Exceptions

{18}   At the adjudicatory hearing, CYFD argued that all the Child's statements were admissible under Rule 11–803(X). This Rule provides that a statement that is not specifically covered by any of the other hearsay exceptions, but that has the "equivalent circumstantial guarantees of trustworthiness" of the other exceptions, may be admissible under the following circumstances:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(1) the statement is offered as evidence of a material fact;

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Rule 11–803(X).

{19}   When CYFD offered the Child's hearsay statements under Rule 11–803(X), it relied upon *State v. Trujillo*, 2002–NMSC–005, 131 N.M. 709, 42 P.3d 814, for authority, a case in which the New Mexico Supreme Court had upheld the admission of a witness statement under Rule 11–803(X). In so doing, the Supreme Court rejected an approach articulated in *State v. Barela*, 97 N.M. 723, 726, 643 P.2d 287, 290 (Ct.App.1982), that has been used by this Court in the past to analyze the admissibility of statements under Rule 11–803(X). *See, e.g., In re Esperanza M.*, 1998–NMCA–039, ¶ 26, 124 N.M. 735, 955 P.2d 204. In *Trujillo*, the Supreme Court stated that "[t]his narrow interpretation of [Rule 11–803(X)] has been rejected by a majority of circuits, and we decline to adopt it in our jurisdiction." *Trujillo*, 2002–NMSC–005, ¶ 16, 131 N.M. 709, 42 P.3d 814. The Supreme Court concluded that adopting the narrow interpretation of the rule articulated in *Barela* "would deprive [a factfinder] of reliable probative evidence relevant to the [factfinder's] truth-seeking role." *Id.*

{20}   Because Rule 11–803(X) is not a firmly rooted hearsay exception, statements offered under this exception must demonstrate sufficient guarantees of trustworthiness. *Massengill*, 2003–NMCA–024, ¶ 14, 133 N.M. 263, 62 P.3d 354. The test for admissibility "under the catch-all rules is whether the out-of-court statement . . . has circumstantial guarantees of trustworthiness." *Trujillo*, 2002–NMSC–005, ¶ 17, 131 N.M. 709, 42 P.3d 814 (quoted authority and quotation marks omitted). In assessing trustworthiness under the catchall exceptions to the hearsay rule, " 'the statement must be inherently reliable at the time it is made.' " *Id.* (quoting *State v. Williams*, 117 N.M. 551, 561, 874 P.2d 12, 22 (1994)). And, as with the firmly rooted exceptions to the hearsay rule, the guarantees of trustworthiness "must likewise be drawn from the totality of circumstances that surround the making of the statement." *Idaho v. Wright*, 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). In *Wright*, a case also involving hearsay statements by a sexually abused child, the Supreme Court "decline[d] to endorse a mechanical test for determining 'particularized guarantees of trustworthiness" ' but did identify several factors that might be assessed in determining whether a child's hearsay statement was trustworthy, including spontaneity, consistent repetition, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. *Id.* at 821–22, 110 S.Ct. 3139.

{21}   The Court in *Trujillo* defined the following four primary dangers of hearsay, which might make a statement unreliable:

(1) Ambiguity-the danger that the meaning intended by the declarant will be misinterpreted by the witness and hence the jury; (2) Lack of candor-the danger the declarant will consciously lie; (3) Faulty memory-the danger that the declarant simply forgets key material; and (4) Misperception-the danger that the declarant misjudged, misinterpreted, or misunderstood what he [or she] saw.

*Trujillo*, 2002–NMSC–005, ¶ 17, 131 N.M. 709, 42 P.3d 814. A reviewing court determines trustworthiness by applying these cri-

teria to statements offered under the catchall exception. *Massengill,* 2003–NMCA–024, ¶ 32, 133 N.M. 263, 62 P.3d 354. When CYFD moved the admission of the statements under Rule 11–803(X), it argued that none of the problems described in *Trujillo* was present in the testimony. We agree. In this case, the Child's consistent recounting of the sexual abuse possesses sufficient indicia of reliability to allay concerns about the four dangers. As to the danger of ambiguity, the statements were clear and direct, and the language used by the Child in describing the abuse consisted of terms both appropriate for a young child as well as some unexpected terminology. She related in a forthright manner that Father had put his "wee-wee" next to her "wee-wee" and next to her "butt." *See State v. D.R.,* 109 N.J. 348, 537 A.2d 667, 673 (1988) (observing that "young children ... do not necessarily regard a sexual encounter as shocking or unpleasant, and frequently relate such incidents to a parent or relative in a matter-of-fact manner"). The Child also demonstrated on her body what actions and which parts of the body she was describing. It is unlikely that the witnesses who heard these graphic, yet child-like, descriptions of the events misinterpreted their meaning. *See Doe v. United States,* 976 F.2d 1071, 1081 (7th Cir.1992) (stating that the consistency and graphic descriptions by the three-year-old victim indicated that the statements were reliable). In the matter of candor, no one has suggested that the Child was lying or had any reason to lie when she made these statements. Although Parents contend on appeal that there were others who had access to the Child after she was removed from the home who could have been responsible for the sexual abuse, the Child has always clearly and consistently identified Father and Mother in her statements. It is improbable that she would have confused her Parents with another perpetrator. Further, when the Child first disclosed the abuse, the foster mother carefully asked the Child to distinguish between Father and the foster father, and the Child identified Father as the perpetrator. Parents also suggest that the Child might have imagined sex with Father because the Child stated that she had seen Parents engaged in sexual activity. Howev-

er, the Child's statements distinguish between Parents' sexual acts that she had observed from those acts involving Father and the Child. Her spontaneous statements to the foster mother and to the professionals with whom she spoke about sexual abuse were consistent in their description of the abuse and in their identification of Father as the assailant and Mother as being in the room. *See Doe,* 976 F.2d at 1081 (five-year-old's statements spontaneous when "she explained what had occurred with little prompting") (citation omitted). As the CYFD social worker observed in her testimony, all the Child's disclosures have been consistent as to the location, to the events that happened, and to the parties present. *See U.S. v. Harrison,* 296 F.3d 994, 1004 (10th Cir.2002) (concluding that the consistency of the victim's three statements was "a strong indicator of the trustworthiness" of the statements). Finally, it is unlikely that the Child misperceived what happened to her; her statements and her demonstrations of Father's actions provided clear descriptions of sexual assault.

{22} In addition to the requirement of circumstantial guarantees of trustworthiness, the catchall exceptions provide that a hearsay statement must also meet the following conditions to be admissible:

> (1) the statement is offered as evidence of a material fact;

> (2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

> (3) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Rule 11–803(X); Rule 11–804(B)(5). In this case, the Child's hearsay statements were evidence of material facts-the occurrence of sexual abuse, the nature of the abuse, and the identity of the perpetrator. Parents do not contest that the statements were "offered as evidence of a material fact." Rule 11–803(X)(1). On appeal, Father asserts that testimony by the Child would have been more probative than the Child's hearsay statements. Several courts have held to the contrary in responding to similar assertions.

In *United States v. Nick*, 604 F.2d 1199, 1204 (9th Cir.1979), for example, the Court, in discussing the hearsay statement of a three-year-old child who had been sexually assaulted, found the statement to be "unquestionably material" and probative as to the identity of the assailant. The Court concluded that "[t]he declaration to his mother at the time of the event was more, rather than less probative than testimony that he might have been able to give months after the event even if the district court would have found him competent." *Id. See State v. Loughton*, 747 P.2d 426, 429 (Utah 1987) (observing that out-of-court statements made by child victims of sexual abuse regarding the incidents provide more accurate accounts of the incident because they are "made nearer to the time of the incident and removed from the pressure of a courtroom situation"). In this case, the Child's statements were more probative on the issue of sexual abuse than any other evidence CYFD could procure through reasonable efforts; the only individuals involved were Father, Mother, and the Child. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (recognizing that "[c]hild abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim"). Finally, the interests of justice were served by admitting the statements of the Child. She had been the victim of sexual abuse, she was the only one who could identify the perpetrator, and her statements provided the only available account of the abuse.

{23} We affirm the children's court admission of the Child's hearsay statements. In admitting the statements, the children's court considered the content of the statements and the circumstances in which they were made. The court found that the statements were inherently reliable, noting in particular the age of the Child, the manner in which the issue was raised, the nature of the utterances, and the consistency of her statements. These findings are supported by the record. We conclude that the Child's hearsay statements are supported by guarantees of trustworthiness equivalent to those which sustain the other enumerated exceptions to the hearsay rule. The children's court did not abuse its discretion in admitting the Child's hearsay statements through the testimony of the foster mother, the CYFD social worker, the Safe House interviewer, and the All Faiths program therapist.

{24} Parents also assert that the children's court erred when it permitted CYFD's witnesses to testify without first determining whether the Child was unavailable and whether the Child was competent. They argue that the children's court was required to determine whether or not the Child would have been competent to testify as a witness before admitting the hearsay statements. Mother also appears to contend that the Child would have to be found competent before the hearsay statements could ever be admitted. However, neither Parent has cited to any authority that supports their contention. *See* Rule 12–213(A)(4) NMRA 2004; *see also Wolford v. Lasater*, 1999–NMCA–024, ¶ 18, 126 N.M. 614, 973 P.2d 866 (stating that issues raised but unsupported by cited authority will not be reviewed on appeal). The cases that Parents do rely upon are not helpful. The cases are factually distinct from this case, and Parents' argument was not addressed by the cases. *See City of Sunland Park v. Paseo Del Norte Ltd. P'ship*, 1999–NMCA–124, ¶ 7, 128 N.M. 163, 990 P.2d 1286 (stating that an opinion should not be used as authority for a proposition not explicitly addressed in the opinion).

{25} Nevertheless, this contention was addressed in *State v. C.J.*, 148 Wash.2d 672, 63 P.3d 765 (2003) (en banc), in a manner which we find to be persuasive. The Court distinguished between the two concepts as follows:

The different standards for determining testimonial competency and the reliability of an out of court statement are justifiably tailored to satisfy different purposes. The trial setting requires that a witness give reliable testimony and fully participate in cross examination, thus the witness' ability to distinguish truthful statements from false statements, and knowledge of his sworn obligation to tell the truth, is paramount. On the other hand, hearsay exceptions necessarily contemplate that the

declarant's perception, memory, and credibility will not be explored through the use of cross examination. Instead, the trial court must find that the circumstances surrounding the making of the statement render the statement inherently trustworthy.

*Id.* at 771, 63 P.3d 765. We are in agreement with the Court in *C.J.* that a determination that a child witness is incompetent to testify at the time of trial would not "resolve the question whether an out of court statement by a child is admissible if the statement is reliable." *Id.* at 770, 63 P.3d 765. Admissibility would not "depend on whether the child is competent to take the witness stand, but on whether the comments and circumstances surrounding the statement indicate it is reliable." *Id.* at 771, 63 P.3d 765. In this case, the children's court found that the circumstances surrounding the Child's statements made them trustworthy.

{26} Moreover, in this case, the Child's statements regarding sexual abuse were offered under Rule 11–803(X), and neither Parent objected at the adjudicatory hearing to the use of Rule 11–803(X). Under Rule 11–803, unavailability of the declarant is immaterial to the introduction of evidence under exceptions to the rule against hearsay. Statements that meet the requirements of the hearsay exceptions are not excluded by the hearsay rule, even though the declarant is available as a witness. *See generally* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 807 (Joseph M. McLaughlin ed., 2d ed.2004) (discussing Fed.R.Evid. 807 which combined the former federal catchall exceptions, Rule 803(24) (availability of declarant immaterial) and Rule 804(b)(5) (declarant unavailable) and which now permits trustworthy statements, regardless of the availability of the declarant); *see also Tartaglia v. Hodges,* 2000–NMCA–080, ¶ 9, 129 N.M. 497, 10 P.3d 176 (stating that because the declarants were deceased, the appropriate hearsay rule for admitting their testimony was Rule 11–804(B)(5) rather than Rule 11–803(X), but recognizing that the point was inconsequential because the requirements of the catchall exceptions are identical).

{27} A similar argument was addressed by the United States Supreme Court in *Wright,* in which the Court noted that it had previously refused to create a rule barring the admission of prior hearsay statements made by a declarant "who is unable to communicate to the jury at the time of trial." 497 U.S. at 825, 110 S.Ct. 3139. The Supreme Court observed that "[a]lthough such inability might be relevant to whether the earlier hearsay statements possessed particularized guarantees of trustworthiness, a *per se* rule of exclusion would not only frustrate the truth-seeking purpose of the Confrontation Clause, but would also hinder States in their own 'enlightened development in the law of evidence.'" *Id.* (citation omitted). The Supreme Court concluded that "[o]ut-of-court statements made by children regarding sexual abuse arise in a wide variety of circumstances, and we do not believe the Constitution imposes a fixed set of procedural prerequisites to the admission of such statements at trial." *Id.* at 818, 110 S.Ct. 3139. We find no error on the part of the children's court.

**B. Rule 11–803(D): Statements for Medical Diagnosis or Treatment**

█ {28} The testimony of the licensed All Faiths program therapist who was providing therapy to the Child was also offered under Rule 11–803(D) which deals with statements made for purposes of medical diagnosis or treatment. As a preliminary matter, we note that the only objection raised by Parents at the adjudicatory hearing went to the application of the Rule. Parents argued that a medical expert should not be allowed to identify the perpetrator of the abuse. On appeal, Parents raise for the first time a number of additional objections to the admission of the program therapist's statement under Rule 11–803(D). Because these objections were not raised below, they were not preserved, and, accordingly, we do not consider them. *See* Rule 1–046 NMRA 2004; *Madrid v. Roybal,* 112 N.M. 354, 356, 815 P.2d 650, 652 (Ct.App.1991) (stating that the primary purpose of the preservation rule is to alert the district court to the claimed error so that the court has an opportunity to correct it).

{29}   Rule 11–803(D) provides for the admission of statements made for purposes of medical diagnosis or treatment under the following circumstances:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

{30}   In *State v. Altgilbers,* this Court adopted an approach that had been articulated by Justice Powell in *Morgan v. Foretich,* 846 F.2d 941, 950–53 (4th Cir.1988) (Powell, J., concurring in part and dissenting in part), writing about Federal Rule of Evidence 803(4) which is identical to our Rule 11–803(D). *Altgilbers,* 109 N.M. 453, 458, 786 P.2d 680, 685 (Ct.App.1989). Under that approach the hearsay exception for statements made for medical diagnosis or treatment would apply " 'so long as the statements made by an individual were relied on by the physician in formulating his opinion.' " *Id.* at 458–59, 786 P.2d at 685–86 (quoting *Morgan,* 846 F.2d at 952). In *Altgilbers,* this Court upheld the admission of the sexual abuse victim's statement to medical personnel identifying the perpetrator because the identification was important to diagnosis and treatment. *Id.* at 457–60, 786 P.2d at 684–87. "In dealing with child sexual abuse . . . disclosure of the perpetrator may be essential to diagnosis and treatment." *Id.* at 459, 786 P.2d at 686. "Statements revealing the identity of the child abuser are 'reasonably pertinent' to treatment because the physician must be attentive to treating the child's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." *United States v. Joe,* 8 F.3d 1488, 1494 (10th Cir.1993). In another case involving child sexual abuse, *United States v. Renville,* 779 F.2d 430, 437–38 (8th. Cir.1985), the Eighth Circuit noted two reasons why the identity of a perpetrator is pertinent to diagnosis in a child sexual abuse case.   First, a proper diagnosis of a child's psychological problems resulting from sexual abuse or rape will often depend on the identity of the abuser.   Second, information that a child sexual abuser is a member of the patient's household is reasonably pertinent to a course of treatment that includes removing the child from the home.   *Id.* at 438.

█   {31}   This Court has previously held that in a civil children's court action, "if the State establishes a foundation that the identity of the perpetrator was 'reasonably pertinent' for medical diagnosis or treatment, the children's court may admit hearsay testimony identifying a perpetrator under Rule 11–803(D)." *In re Esperanza M.,* 1998–NMCA–039, ¶ 15, 124 N.M. 735, 955 P.2d 204.   In this case, the program therapist from All Faiths testified to the importance of the identity of the perpetrator.   She stated that the purpose of her therapy sessions with the Child was for diagnosis and treatment and that, in order to properly treat a child sexual abuse victim, it was essential to know the identity of the abuser.   The Child's statements about the sexual abuse were of the type upon which medical personnel reasonably rely in treatment or diagnosis and meet the standards for admission set forth in Rule 11–803(D).   The children's court did not abuse its discretion in admitting the Child's statements to the All Faiths program therapist.

{32}   In *In re Esperanza M.,* this Court observed that "[t]here is support for the broadening of [Rule 11–803(D) ] in child abuse cases to embrace statements identifying abusers and describing their acts because such cases involve abuse victims who talk to psychologists and social workers." 1998–NMCA–039, ¶ 20, 124 N.M. 735, 955 P.2d 204 (quoted authority and quotation marks omitted).   This Court did not reach the decision of whether Rule 11–803(D) would apply to the testimony of social workers because, in that case, a proper foundation for the admission of the social worker's testimony on that basis had not been laid.   *Id.*   In this case, however, the requisite foundation has been established: the program therapist, who is a licensed master social worker, was accepted as an expert on treatment, and she testified

that the identity of the perpetrator was pertinent to her treatment of the Child. We believe that recognition of the role licensed social workers play in providing treatment to victims of child abuse and neglect, as well as to others, would be consistent with the Legislature's recognition of the professional nature of their services. *See* NMSA 1978, § 61–31–1 (1989); NMSA 1978, § 61–31–24 (1989). As the United States Supreme Court recognized:

> Today, social workers provide a significant amount of mental health treatment. Their clients often include the poor and those of modest means who could not afford the assistance of a psychiatrist or psychologist, but whose counseling sessions serve the same public goals. Perhaps in recognition of these circumstances, the vast majority of States explicitly extend a testimonial privilege to licensed social workers.... Drawing a distinction between the counseling provided by costly psychotherapists and the counseling provided by more readily accessible social workers serves no discernible public purpose.

*Jaffee v. Redmond*, 518 U.S. 1, 15–17, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (quoted authority and quotation marks omitted). We conclude that the children's court properly admitted the testimony of the licensed social worker under Rule 11–803(D).

### C. Due Process

{33} Parents contend that the admission of the Child's hearsay statements violated their due process rights. At the adjudicatory hearing, they relied upon the confrontation clause to argue that admission of the Child's hearsay statements would violate their constitutional right to confront the witness against them. *See* U.S. Const. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ....."). On appeal, Parents acknowledge that the confrontation clause does not apply in civil cases. *See In re Esperanza M.*, 1998–NMCA–039, ¶ 15, 124 N.M. 735, 955 P.2d 204 (observing that in civil cases, Rule 11–803 provides the threshold requirements for the admission of hearsay but that in criminal cases, admissibility is also subject to the limits of the Confrontation Clause); *accord Altgilbers*, 109 N.M. at 460, 786 P.2d at 687 (distinguishing between admission of statements under Rule 11–803(D) in civil and criminal cases). They now contend instead that the admission of the Child's statements violated their right to due process under both the federal and state constitutions because they were not able to confront the witness against them, the Child. Although Father mentioned the New Mexico Constitution in the motion in limine to the children's court, neither Parent has argued on appeal that the New Mexico Constitution provides greater protection than the United States Constitution. *See State v. Gomez*, 1997–NMSC–006, ¶¶ 22–23, 122 N.M. 777, 932 P.2d 1 (discussing the standard for preserving state constitutional claims for appellate review). We therefore review these claims under the federal constitution.

{34} In *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the United States Supreme Court adopted a flexible balancing test to determine whether an individual has been afforded due process. *See also Mafin M.*, 2003–NMSC–015, ¶ 19, 133 N.M. 827, 70 P.3d 1266; *State ex rel. Children, Youth and Families Dep't v. Anne McD.*, 2000–NMCA–020, ¶ 18, 128 N.M. 618, 995 P.2d 1060. The three factors to be weighed in the balancing test are (1) the private interest; (2) whether the procedures used increased the risk of an erroneous deprivation of that interest and whether additional safeguards would lower that risk; and (3) the government's interest. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893. In an abuse and neglect case, the parents' interest in the relationship with their child is the private interest. As to the government's interest, "[t]he State has an equally significant interest in protecting the welfare of children." *Mafin M.*, 2003–NMSC–015, ¶ 20, 133 N.M. 827, 70 P.3d 1266. In balancing the parents' interests and the government's interest, the second prong of the *Mathews* test is frequently the determinative factor. *Id.*

{35} On appeal, Parents contend that there was a high risk of error in the

proceedings because the Child did not testify at the adjudicatory hearing. Notwithstanding, at the adjudicatory hearing neither Parent called for the Child to testify or requested the children's court to explore alternative procedures for the Child's testimony. Parents now assert that having the Child testify in a less formal setting than that of the courtroom might have decreased any risk of error. Under *Mathews,* the purpose of any additional procedures is to reduce the risk of an erroneous decision. 424 U.S. at 335, 96 S.Ct. 893. It is not clear from the record that having the Child testify would have increased the reliability of the outcome. The Child's therapist expressed serious reservations about the prospect and also stated that it was questionable whether the Child would talk about the abuse in such a setting. *See D.R.,* 537 A.2d at 673 (concluding that "a child victim's spontaneous out-of-court account of an act of sexual abuse may be highly credible because of its content and the surrounding circumstances" and noting that, in contrast, "the reliability of in-court testimony of a young child victimized by a sexual assault is often affected by the stress of the courtroom experience, the presence of the defendant, and the prosecutor's need to resort to leading questions").

{36} Rule 11–803(D) and Rule 11–803(X) require hearsay statements to have guarantees of reliability before they can be admitted. The exceptions to the hearsay rules themselves "are designed to facilitate the admission of probative evidence and, at the same time, to minimize the risks of unreliability." *Nick,* 604 F.2d at 1203. As the *Wright* Court stated in discussing the relationship of hearsay statements and the confrontation clause, "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Wright,* 497 U.S. at 820, 110 S.Ct. 3139.

{37} After reviewing the procedures used at the adjudicatory hearing, we conclude that Parents' rights to procedural due process were not violated. Parents received proper notice of CYFD's intent to use the Child's statements. They were each represented by able attorneys who argued vigorously on their behalf and carefully cross-examined CYFD's witnesses about the reliability and credibility of the Child's statements, and a guardian ad litem had been appointed for the Child. The children's court, aware of Parent's objections, initially admitted the witnesses' testimony about the hearsay statements conditionally. At the close of evidence, the court was satisfied that the statements were reliable and admitted them. The children's court concluded the hearsay statements possessed the required reliability, and we have affirmed the court's decision to admit the statements. Finally, the children's court determined that there was clear and convincing evidence to support the amended petition before it held that the Child was abused and neglected under Section 32A–4–2(B)(3) and (4) and Section 32A–4–2(E)(3). The admission of the Child's statements did not violate Parents' constitutional rights to due process.

### D. Sufficiency of the Evidence

{38} Mother also contends that there was insufficient evidence to support the children's court determination that the Child was a neglected child under Section 32A–4–2(E)(3). This section of the children's code defines a neglected child as one who was physically or sexually abused "when the child's parent ... knew or should have known of the abuse and failed to take reasonable steps to protect the child from further harm[.]" Section 32A–4–2(E)(3). Mother bases part of her sufficiency claim on the assumption that the children's court erred in admitting the Child's hearsay statements. Because we have determined that the children's court did not err in admitting the statements, we do not consider this aspect of her claim. Mother also appears to argue that even if the Child's hearsay statements were properly admitted, the statements, as the sole evidence presented of sexual abuse, would still be insufficient to support the conclusion of the children's court. We disagree with Mother's assessment of the merits of the hearsay statements and also note that the hearsay statements were not the only evidence presented. The children's court heard non-hearsay testimony about the

Child's sexualized and aggressive behavior as well testimony that those behaviors were consistent with PTSD. The remaining part of Mother's insufficiency claim is based on an attempt to shift responsibility for the sexual abuse from Father and Mother to "someone in one of [the Child's] foster placements." She asserts that "there are two absolutely equal inferences" to be drawn from the Child's statements. Even if we were to credit this blame-shifting assertion, which we do not, Mother's argument is inapt. On appeal, this Court does not reweigh the evidence but rather views the evidence in the light most favorable to the decision below in reviewing whether there was clear and convincing evidence. *In re Termination of Parental Rights of Eventyr J.*, 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.1995). "An appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Sutphin*, 107 N.M. 126, 130–31, 753 P.2d 1314, 1318–19 (1988). The record in this case supports the children's court determination that the Child had been sexually abused by Father and that Mother had failed to protect her from that abuse. *See* Section 32A4–2(B)(3), (4); Section 32A–4–2(E)(3).

#### E.  Jurisdiction

{39}  Although both parties in this case operate under the assumption that we have jurisdiction over what is a final order, we feel compelled to discuss the issue. After this case was assigned to the general calendar, the Court assigned a number of other abuse and neglect cases to the general calendar and directed those parties to brief two questions in addition to the issues being raised by the parties. The questions raised by the Court were (1) whether a judgment adjudicating a child as being abused and neglected is a final order for purposes of appeal and (2) what effect an appeal in a abuse and neglect case has on the jurisdiction of the children's court to proceed with the case below. Although the parties to this appeal were not asked to address these questions, we nevertheless take this opportunity to resolve the questions because this Court would not have jurisdiction to hear an appeal from a non-final order. *Collier v. Pennington*, 2003–NMCA–064, ¶ 7,

133 N.M. 728, 69 P.3d 238. We conclude that because an adjudication of ·abuse and neglect finds the factual predicates for ·further action by CYFD and for orders by the children's court as the case progresses through subsequent stages, it is a sufficiently final order for purposes of appeal to this Court. We also determine that the children's court has jurisdiction to proceed with the case while the abuse and neglect adjudication is on appeal.

{40}  The general rule in New Mexico for determining the finality of a judgment is whether "all issues of law and fact have been determined and the case disposed of by the trial court to the fullest extent possible." *Kelly Inn No. 102, Inc. v. Kapnison*, 113 N.M. 231, 236, 824 P.2d 1033, 1038 (1992) (quoted authority and quotation marks omitted). Although *Kelly Inn* was not dealing with this kind of case, we believe the questions presented in that case were sufficiently analogous for us to rely upon the principles expressed by our Supreme Court for guidance in resolving the questions presented to this Court. In determining finality for purposes of appeal, we are to look to the substance of the judgment, *id.*, keeping in mind a policy of facilitating meaningful and efficient appellate review of issues that affect important rights, *id.* at 240, 824 P.2d at 1042.

{41}  The Abuse and Neglect Act, NMSA 1978, §§ 32A–4–1 to –4–33 (1993, as amended through 2003), provides a comprehensive structure for dealing with the circumstances in which a parent may have abused and/or neglected a child. An abuse and neglect action begins when CYFD files a petition with the children's court containing the factual basis of the action. NMSA 1978, § 32A–1–11 (1993). At the adjudicatory hearing on the petition, the court must determine if the allegations in the petition are admitted or denied. Section 32A–4–20(G) (1999). If the allegations are denied, the court conducts a full evidentiary hearing and then makes findings as to whether the child is an abused and/or neglected child. *Id.* Within the structure of the Children's Code, by the conclusion of the adjudication hearing, the court has resolved all issues of law and fact before it to the fullest extent possible. It is evident that the adjudication affects important rights-an abuse and neglect case must bal-

**152**

ance the parents' interest in their relationship with the child and the State's equally significant interest in protecting the welfare of children. *See Mafin M.*, 2003–NMSC–015, ¶ 20, 133 N.M. 827, 70 P.3d 1266. Additionally, the general provisions of the Children's Code provide for appeals from a judgment of the children's court to this Court. *See* Section 32A–1–17. The statute states that "[i]f the order appealed from grants the legal custody of the child to or withholds it from one or more of the parties to the appeal, the appeal shall be heard at the earliest practicable time." Section 32A–1–17(B). We thus conclude that an abuse and neglect adjudication is a final, appealable order.

{42} While an appeal of an abuse and neglect adjudication is pending, the children's court has jurisdiction to take further action in the case under Section 32A–1–17(B) which states that an appeal to this Court "does not stay the judgment appealed from." The Abuse and Neglect Act provides for additional services by CYFD and further hearings by the court to monitor the actions of CYFD, the well-being of the child, and the progress of the parent. *See, e.g.*, § 32A–4–20; § 32A–4–21; § 32A–4–25. We are in agreement with the briefs presented to the Court that the further hearings conducted by the children's court after the adjudicatory hearing are essential to protect both the rights of the parent and the child.

### III. CONCLUSION

{43} We conclude that this Court has jurisdiction to hear this appeal. The children's court did not abuse its discretion when it found that the Child's hearsay statements possessed equivalent guarantees of trustworthiness and admitted them under Rule 11–803(D) and Rule 11–803(X). The admission of this evidence did not violate Parents' due process rights. Accordingly, we affirm the judgment of the children's court.

{44} **IT IS SO ORDERED.**

WECHSLER, C.J. and KENNEDY, J., concur.