This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-38205

**MELISSA J. REEVES-EVINS,**

Petitioner-Appellant,

v.

**DAVID DANIEL, Personal Representative of the ESTATE OF MICHAEL B. EVINS,**

Counterpetitioner-Appellee.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Jarod K. Hofacket, District Judge**

Kemp Smith LLP
CaraLyn Banks
Las Cruces, NM

for Appellant

Estrada Law, P.C.
Michele Ungvarsky
Las Cruces, NM

for Appellee

## MEMORANDUM OPINION

**B. ZAMORA, Judge.**

**{1}** Melissa Reeves-Evins appeals from the district court's entry of injunctive relief and order appointing David Daniel as personal representative of the Estate of Michael Evins. Reeves-Evins argues that the district court erred (1) in finding that Decedent had testamentary capacity when he executed his March 10, 2017 will (the 2017 Will); (2) in rejecting Reeves-Evins's claim of undue influence by Evins' children and the personal representative; (3) in holding that Evins' attempted revocation of a copy of the 2017 Will was invalid as a matter of law; and (4) in granting temporary injunctive relief prohibiting

Reeves-Evins from distributing assets alleged to be assets of Decedent's estate. We affirm.

**BACKGROUND**

**{2}**     This appeal stems from probate proceedings related to the Estate of Michael B. Evins (Decedent). Decedent and Reeves-Evins married in July 2012. Decedent and Reeves-Evins each had two children from past relationships, and each had accumulated separate property including real property prior to their marriage. Reeves-Evins, an attorney, drafted a prenuptial agreement which Decedent and Reeves-Evins signed after review by independent counsel. The prenuptial agreement identified their separately held property and reflected their agreement that each would retain his or her rights in separate property owned at the time of the marriage. They also agreed, however, that all property acquired after the signing of the prenuptial agreement would be considered shared property unless otherwise designated. The parties further agreed that the character of the separate property identified in the prenuptial agreement could be modified by separate written instrument or conveyance, including by devise.

**{3}**     On October 31, 2016, Decedent executed a will prepared by Reeves-Evins. Decedent appointed Reeves-Evins as his personal representative, gave Reeves-Evins a life estate in certain of his separately held properties, and devised all his remaining personal property, whether separate or community property, to Reeves-Evins.

**{4}**     On January 10, 2017, Decedent suffered a grand mal seizure, and was diagnosed with a brain tumor. Decedent underwent a craniotomy on January 11, 2017; however, only 50 percent of the tumor was removed. After learning of his illness and visiting him in the hospital, both of Decedent's children became more involved in Decedent's life—his son moved into the home with Decedent and Reeves-Evins and his daughter visited the home in Las Cruces almost daily from El Paso, Texas. On January 23, 2017, Reeves-Evins filed a petition to appoint a guardian and conservator for Decedent. Attorney Jill Johnson-Vigil was appointed as Decedent's Guardian Ad Litem. Johnson-Vigil testified at the guardianship hearing that Decedent was able to interact with her, to retain information between meetings and to make decisions. As a result of these meetings, Johnson-Vigil formed the opinion that Decedent did not need a guardian or a conservator. On March 9, 2017, the district court judge overseeing the guardianship matter denied the petition.

**{5}**     The parties agree that Decedent was upset with Reeves-Evins for filing the guardianship proceeding. On March 10, 2017, the day after the court denied the guardianship, Decedent executed the 2017 Will. Decedent employed Johnson-Vigil to draft the 2017 Will after expressing concern about his upcoming surgery in Albuquerque and a desire to ensure that his medical power of attorney and his will were in order beforehand. Decedent's adult children accompanied him to the initial appointment wherein Decedent discussed disposition of his personal property. Johnson-Vigil testified that the Decedent had a detailed list of instructions regarding items of property, as well as photographs of specific items on his cell phone. The children were not present at the

will signing ceremony. The 2017 Will states that it is Decedent's "intent that any former spouse shall inherit nothing under this [w]ill or from my estate" and "that my current spouse, . . . Reeves-Evins, be specifically omitted and is to receive no part of my estate by gift or statutory allowance." The 2017 Will devised assets to Decedent's children, and appointed Daniel, a long-time friend of Decedent, as personal representative. The 2017 Will was placed in a security deposit box jointly owned by Decedent and his children.

{6}     On March 13, 2017, Decedent was evaluated by Dr. Rex Jung, PhD. a neuropsychologist. The neuropsychological evaluation revealed significant cognitive changes from a prior February 28, 2017 evaluation. During the evaluation, Decedent exhibited "moderate difficulty in planning, moderate difficulty in mental flexibility, severe memory difficulty, severe disorientation, severe difficulties in oral comprehension, moderate emotional withdrawal, mild depressive mood, moderate mental fatigability, moderate motor slowing, moderate difficulties in oral expression, moderate reduced alertness, and mild attention difficulties." Due to the changes in Decedent's cognitive status, Decedent was admitted to the University of New Mexico Hospital on the next day, received steroid treatment, and his cognitive function improved. Decedent had a second craniotomy in March 2017, and his condition and cognition improved. Decedent remained married to Reeves-Evins and spent time with her following his second craniotomy. On January 20, 2018, Decedent wrote "REVOKED" on a photocopy of the 2017 Will, and this act was witnessed by family friends and notarized by Reeves-Evins.

{7}     Decedent passed away on August 1, 2018. Following Decedent's death, Reeves-Evins filed an application for informal probate alleging that Decedent died intestate. Reeves-Evins was initially appointed as the personal representative of her husband's estate, but Daniel filed a counter-petition seeking to be appointed as Decedent's personal representative pursuant to the provisions of the 2017 Will. In addition, Daniel filed an application for temporary restraining order (TRO) and preliminary injunction to prevent Reeves-Evins from changing or distributing assets of Decedent's estate. On August 29, 2018, the district court issued a TRO prohibiting Reeves-Evins "from taking any action to instruct or request the transfer, distribution allocation or liquidation of any accounts or assets which [Decedent] owned an interest [in] before his death, including but not limited to retirements accounts, bank accounts, real estate, or personal property[.]" The filing of the counter-petition and the issuance of the TRO prevented Reeves-Evins from administering Decedent's estate.

{8}     The district court held two hearings in December 2018 and February 2019, during which the parties addressed their competing petitions for appointment as personal representatives. At the close of evidence, the district court entered an order granting Daniel's petition to probate the 2017 Will and appointed Daniel as personal representative of the estate. The district court found that (1) Decedent had testamentary capacity at the time he executed the 2017 Will, (2) the 2017 Will was not executed under the undue influence of any third party, (3) Decedent died testate, and (4) the 2017 Will was not revoked. Because the parties agreed to use the hearings to address the parties' competing petitions for appointment as personal representatives rather than presenting evidence and argument with respect to the cross motions for injunctive relief,

the district court did not hear evidence or argument related to the TRO. Instead, the district court extended the TRO on the same date it issued the order appointing Daniel as personal representative. Reeves-Evins appeals from the district court's entry and extension of the TRO, and from the district court's order appointing Daniel as personal representative of the estate of Decedent pursuant to the provisions of the 2017 Will.

**DISCUSSION**

**I.      Standard of Review**

**{9}**     This case presents mixed questions of law and fact. *Ponder v. State Farm Mutual Auto Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960. Accordingly, "we use the substantial evidence standard for review of the facts and then make a de novo review for the trial court's application of the law to those facts." *Id.*; *see  In re Estate of Martinez*, 1983-NMCA-050, ¶ 8, 99 N.M. 809, 664 P.2d 1007 ("In will cases, just as in other matters, we review a challenge to the trial court's findings to determine whether they are supported by substantial evidence; if they are, they will not be disturbed on appeal."). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate support for a conclusion." *In re Estate of Ferrill*, 1981-NMCA-074, ¶ 5, 97 N.M. 383, 640 P.2d 489.

**II.     Substantial Evidence Supports the District Court's Finding That Decedent Had Testamentary Capacity When He Executed the 2017 Will**

**{10}**     Reeves-Evins argues that substantial evidence does not support the district court's finding that Decedent had testamentary capacity because (1) the medical evidence demonstrated a lack of capacity; (2) the district court improperly relied on evidence from and the result of the guardianship proceeding; (3) the district court improperly relied on the prenuptial agreement as evidence of Decedent's intent; and (4) the evidence demonstrated that Decedent did not understand the extent of his estate.

**{11}**     "Contestants of a will have the burden of establishing lack of testamentary intent or capacity[.]" NMSA 1978, § 45-3-407 (1975). "In order to prove testamentary capacity evidence must be introduced that testator had knowledge of: (1) the meaning of executing a will; (2) the extent and character of [his] estate; and (3) the natural objects of [his] bounty." *In re Estate of Kimble*, 1994-NMCA-028, ¶ 18, 117 N.M. 258, 871 P.2d 22. Based on our review of the record, we hold that substantial evidence supported the district court's finding that Decedent had testamentary capacity.

**{12}**     We first address Reeves-Evins' contention that the undisputed medical evidence established that Decedent lacked capacity to execute the 2017 Will. Reeves-Evins' relies primarily on Dr. Jung's expert testimony. Dr. Jung opined that Decedent lacked testamentary capacity on March 10, 2017, when he executed the will because Decedent exhibited "problems with memory and higher executive functioning" on February 27, 2017, and on March 13, 2017, "exhibited moderate difficulty in planning, moderate difficulty in mental flexibility, severe memory difficulty, severe disorientation, severe

difficulties in oral comprehension . . . moderate difficulties in oral expression, moderate reduced alertness, and mild attention difficulties." The district court found Dr. Jung's opinion was speculative because "no evidence was offered by Dr. Jung, or any other witness presented by . . . Reeves-Evins, of the rate of decline of cognition in the Decedent's case or in a typical case, or any methodology for back tracking cognition." The district court ultimately concluded that Dr. Jung's opinion was outweighed by the balance of the evidence, relying upon the March 9, 2017 order, dismissing the guardianship proceeding, and the testimony of Johnson-Vigil, who opined that Decedent had testamentary capacity on the day he signed the 2017 Will.

**{13}** As fact-finder, the district court was tasked with weighing the evidence and resolving any conflicts in the evidence, and we will not reweigh the evidence on appeal. *See Las Cruces Pro. Fire Fighters & Int'l Ass'n of Fire Fighters, Local No. 2362 v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177 (stating that "we will not reweigh the evidence nor substitute our judgment for that of the fact[-]finder"). "The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached" and in this case, it does. *Id.* The district court's finding that Decedent had testamentary capacity when he executed the 2017 Will, is supported by substantial evidence. During the guardianship proceedings which occurred in the months prior to Decedent's execution of the 2017 Will, Johnson-Vigil testified that Decedent was able to interact with her at each meeting, retain information between meetings, and make decisions. As a result of these meetings, Johnson-Vigil formed the opinion that Decedent did not need a guardian or a conservator, and the district court judge overseeing the guardianship matter ultimately denied the petition. Subsequently, when Decedent approached Johnson-Vigil about drafting and executing the 2017 Will immediately following termination of the guardianship proceeding, Johnson-Vigil confirmed that the 2017 Will represented the Decedent's wishes and satisfied herself through specific questions and interactions that Decedent had capacity to execute the will. Decedent identified the documents he was signing, indicated he read each document made a part of the 2017 Will, indicated he understood that the documents were distributing his property, and indicated that he was not under the influence of any medication, duress, or pressure from third persons. Johnson-Vigil's observations from the day of execution carry particular weight because "[i]t is not the [testator's] general mental capacity that is critical, but rather the condition of [his] mind at the time [he] executed the will." *Lucero v. Lucero*, 1994-NMCA-128, ¶ 18, 118 N.M. 636, 884 P.2d 527. As Dr. Jung himself admitted, "I have all of the data subsequent to the signing of the will, but . . . I didn't evaluate him on that day. So we have to infer his capacity based on the evidence that we have surrounding that." In addition, a year later, in April 2018, Decedent confirmed his testamentary intent again when he indicated to Johnson-Vigil that he did not need the 2017 Will updated or modified. We perceive no error in the district court's decision to assign greater weight to the testimony of Johnson-Vigil and the findings of the guardianship proceeding and these matters provide substantial evidentiary support for the district court's ultimate determination that Decedent had testamentary capacity when he executed the 2017 Will.

**{14}**   Reeves-Evins also argues that Daniel failed to prove that Decedent was ever on steroids or that he discontinued them, and accordingly, contends that the district court erred in finding that sometime prior to March 13, 2017, Decedent had stopped taking a steroid medication and that this caused his brain swelling. After reviewing the record, we agree with Reeves-Evins that whether Decedent used or discontinued steroids was never affirmatively established.[1] However, it is clear that the evidence regarding Decedent's alleged steroid use and discontinuation did not influence the district court's ultimate determination that Decedent lacked capacity. The district court stated, "It was not made clear to the [c]ourt when . . . Decedent stopped taking his steroid [medication]. There was no evidence offered to suggest how long after ceasing to take the steroid would the swelling begin to accelerate, nor how much swelling was necessary to observe any cognitive decline nor how much cognitive decline must be observed to cause . . . Decedent to lose testamentary capacity." As our Supreme Court has noted, "[a] judgment supported by proper findings is not vitiated by findings on immaterial points or issues, for example, on issues . . . unsupported by evidence, or where, whatever the finding on the issue, it affords appellant no cause of action or ground of defense but is without legal consequence; such findings may be treated as surplusage and disregarded[.]" *New Jersey Zinc Co. v. Local 890 of Int'l Union of Mine, Mill & Smelter Workers*, 1952-NMSC-062, ¶ 29, 56 N.M. 447, 245 P.2d 156. We are satisfied that the evidence regarding Decedent's alleged steroid use and discontinuation did not affect the district court's ultimate finding that Decedent lacked capacity.

**{15}**   Next, Reeves-Evins contends that the district court improperly relied on evidence from the guardianship proceeding in making its determination regarding Decedent's capacity because the evidence adduced in the guardianship proceeding was substandard.[2] However, Reeves-Evins did not appeal the guardianship proceeding and the district court was entitled to take judicial notice of the pleadings, and final judgment set forth in the guardianship proceeding. We will not address Reeves-Evins' arguments regarding the sufficiency of the evidence in guardianship case because the guardianship proceeding is not the subject of this appeal and the order entered in that matter is final. *See In re Estate of Baca*, 1980-NMSC-135, ¶ 11, 95 N.M. 294, 621 P.2d 511 ("The law is settled in New Mexico that every presumption consistent with the record is indulged in favor of the jurisdiction of courts of general jurisdiction whose judgments cannot be questioned when attacked collaterally, unless lack of jurisdiction appears affirmatively on the face of the judgment or in the judgment roll or record, or is made to appear in some other permissible manner."); *McDonald v. Padilla*, 1948-NMSC-066, ¶ 18, 53 N.M. 116, 122, 202 P.2d 970 ("The universal rule adhered to by the courts is that the judgment or final order of a court having jurisdiction of the subject-

---

1Dr. Jung's report does not indicate whether Decedent was taking steroids prior to their administration at the University of New Mexico Hospital. At trial, counsel for Daniel argued that Decedent was on steroids, but he had run out and was not taking steroids for several days before he was admitted to the hospital on an emergency basis. Over objections, counsel asked Dr. Jung to assume this fact and asked what role steroids played in the case. The district court allowed the questions for the "sake of efficiency" but cautioned that it would not "take it as evidence unless some evidence was presented."

2The district court noted that "the court order in the Guardianship case on March 9, 2017 [the day prior to Decedent signing the 2017 Will] finding that the Decedent did not need a guardian or conservator is compelling evidence of Decedent's capacity."

matter and the parties, however erroneous, irregular or informal such judgment or order may be, is valid until reversed or set aside."), *superseded statute as stated in Webb v. Az. Pub. Servs. Co.*, 1981-NMCA-007, 95 N.M. 603, 624 P.2d 545.

**{16}** Reeves-Evins contends that the district court should not have relied on the prenuptial agreement as evidence that Decedent intended to disinherit his wife, because the prenuptial agreement allowed the parties to make a "gift, grant, or conveyance" by will or codicil. While the district court did find that Decedent's disinheritance of Reeves-Evins was "consistent with his prenuptial agreement" and that devising his estate to his children was a "plan . . . documented in [the] prenuptial agreement," the district court did not make these findings in the section of the order addressing capacity, and accordingly, we are not persuaded that the district court considered the prenuptial agreement to be relevant to that issue. Even if the district court did consider the prenuptial agreement when making its capacity determination, however, the district court was permitted to consider the prenuptial agreement. We perceive no error in the district court's consideration of the prenuptial agreement as evidence that the parties intended (at least initially) to keep their property separate, nor do we perceive any error with the court's assertion that Decedent's decision to disinherit Reeves-Evins was consistent therewith. "This Court does not reweigh the evidence on appeal and is bound by the [district] court's findings of fact unless they are demonstrated to be clearly erroneous or not supported by substantial evidence." *Doughty v. Morris*, 1994-NMCA-019, ¶ 9, 117 N.M. 284, 871 P.2d 380 (internal quotation marks and citation omitted).

**{17}** Finally, Reeves-Evins argues that Decedent lacked testamentary capacity because he did not understand the extent of his estate. Specifically, she contends that Decedent did not know which items of personal property belonged to him, asserting that Decedent's children took the photographs of the items that were bequeathed in the 2017 Will and claiming that some of these items were actually the personal property of Reeves-Evins. We begin by noting that Reeves-Evins' assertion that the photographs were taken by Decedent's children is speculative—Reeves-Evins was not present at the meeting with Johnson-Vigil where the photographs were presented, and she did not offer any proof that the photographs were taken by Decedent's children. While the district court did not make any specific findings of fact regarding whether any of the personal property devised actually belonged to her and not Decedent, Reeves-Evins was permitted to present this argument to the district court during the evidentiary hearings. We are not persuaded that the district court did not weigh this evidence when determining whether Decedent understood "the extent and character of [his] estate; and . . . the natural objects of [his] bounty[,]" *In re Estate of Kimble*, 1994-NMCA-028, ¶ 18, nor do we believe that Decedent's misunderstanding about a small number of items is sufficient to show he lacked an overall understanding of the 2017 Will. Reeves-Evins also argues that Decedent only vaguely understood his ownership interest in a piece of real property known as the Las Alturas property. While the record does reflect that Decedent was not aware of the precise nature of his interest in the property, Johnson-Vigil testified that "he knew that it had been his property, he knew that there was this document [a life estate through a 2016 [will and a contribution agreement] between him

and Ms. Reeves-Evins [which] may have changed the nature of his sole and separate property[.]" Johnson-Vigil's testimony reflects that Decedent was aware he had an ownership interest in the property, and even if Decedent did not fully understand the full effect of the life estate and contribution documents affecting that interest, her testimony indicates that Decedent asked specific questions of his attorney for the purposes of understanding the agreements he had entered into. Decedent was a lay person and not a lawyer, and any confusion he had about the minute details of a contribution agreement and a life estate do not reflect a lack of capacity. In other contexts, this Court has noted that complex matters such as contracts often evade the understanding "of a reasonably intelligent layman[.]" *Computer Corner, Inc. v. Fireman's Fund Ins. Co.*, 2002-NMCA-054, ¶ 7, 132 N.M. 264, 46 P.3d 1264 (internal quotation marks and citation omitted) (noting that the law assumes a layperson will have limited knowledge of contracts in the insurance context). Decedent's conversation with Johnson-Vigil reflects no more than a reasonable attempt to seek legal help in understanding the full extent of his interest and does not reflect that he lacked knowledge of "the extent and character of [his] estate" sufficient to support a finding that Decedent lacked capacity. *In re Estate of Kimble*, 1994-NMCA-028, ¶ 18.

**{18}** We hold that substantial evidence supports the district court's finding that Decedent had capacity when he executed the 2017 Will.

### III. The District Court Did Not Abuse its Discretion in Excluding Hearsay Statements

**{19}** Reeves-Evins also argues that the district court should not have ruled that certain statements Dr. Jung relied on were hearsay. The decision to exclude evidence rests within the discretion of the district court, "and the court's determination will not be disturbed on appeal in the absence of a clear abuse of that discretion." *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 36, 127 N.M. 47, 976 P.2d 999 (internal quotation marks and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effects of the facts and circumstances of the case, is clearly untenable, or is not justified by reason." *State v. Balderama*, 2004-NMSC-008, ¶ 22, 135 N.M. 329, 88 P.3d 845. We accord more flexibility "in making admissibility determinations" to judges overseeing bench trials as opposed to jury trials, *Tartaglia v. Hodges*, 2000-NMCA-080, ¶ 30, 129 N.M. 497, 10 P.3d 176, and "view the [district] court's actions from the perspective of its ultimate determination, and not from the perspective of what it particularly said in admitting items of evidence." *Id.*

**{20}** Reeves-Evins correctly asserts that an expert may rely on hearsay when forming an opinion. *See* Rule 11-703 NMRA ("An expert may base an opinion on facts or data in the case that the expert has been made aware[.] If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). However, our review of the record indicates that the district court *did* allow Dr. Jung to testify regarding his expert opinion based, in part, on the hearsay statements, and merely made it clear that the district court would not consider the hearsay statements as independent proof of

incapacity. The district court explicitly states, "Although it may be appropriate for Dr. Jung to rely on reports of other medical providers to help inform his own observations, the reliance on statements of family members to other providers is not entitled to the same consideration by this [c]ourt as useful evidence of a fact." The district court's decision to allow Dr. Jung to rely on the statements as a basis for his expert opinion while finding that the statements themselves were not entitled to the same consideration as useful evidence of fact, is not "clearly against the logic and effects of the facts and circumstances of the case[.]" *Balderama*, 2004-NMSC-008, ¶ 22. We hold that the district court did not abuse its discretion.[3]

## IV.    Substantial Evidence Supports the District Court's Finding that Decedent Was Not Subjected to Undue Influence

**{21}**    Reeves-Evins argues that the district court erred in finding that Decedent was not subjected to undue influence when Decedent executed the 2017 Will. Undue influence is "influence, improperly exerted, which acts to the injury of the person swayed by it or to the entry of those persons whom he or she would have benefitted." *Chapman v. Varela*, 2009-NMSC-041, ¶ 6, 146 N.M. 680, 213 P.3d 1109 (alteration, internal quotation marks, and citation omitted). In order to raise a presumption of undue influence, Reeves-Evins must show that a confidential or fiduciary relationship existed; that the will proponent used their position to unfairly and improperly influence Decedent to the injury of those persons who would have benefitted in the absence of the influence; or that the will proponent unfairly and improperly influenced Decedent so "as to prevent him from exercising a free and understanding judgment when he executed his will." *Id.* ¶ 14 (internal quotation marks and citation omitted). A will may be presumed invalid because of undue influence, if there is "enough evidence to allow the finder of fact to find clearly and convincingly that [the non-movant] had a confidential relationship and that suspicious circumstances existed." *Id.* ¶ 17. Such circumstances include:

> (1) old age and weakened physical or mental condition of testator; (2) lack of consideration for the bequest; (3) unnatural or unjust disposition of the property; (4) participation of beneficiary in procuring the gift; (5) domination or control over the donor by a beneficiary; and (6) secrecy, concealment, or failure to disclose the gift by a beneficiary.

*Id.* ¶ 7 (internal quotation marks and citation omitted). Undue influence can be inferred "where one person exercises such dominion over the will of another as to cause the latter to confer a benefaction which would not have been made if the benefactor had exercised his own deliberate judgment, reason or discretion." *Giovannini v. Turretta*,

---

3Reeves-Evins also argues that these statements fall within exceptions to the hearsay rule, but she does not point to where this argument was preserved below. "[O]n appeal, the party must specifically point out where, in the record, the party invoked the court's ruling on the issue. Absent [a] citation to the record or any obvious preservation, we will not consider the issue." *Crutchfield v. N.M. Dep't of Tax'n & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273.

1966-NMSC-103, ¶ 6, 76 N.M. 344, 414 P.2d 855 (internal quotation marks and citation omitted).

**{22}**   Reeves-Evins first contends that Decedent's impaired mental condition made him susceptible to undue influence. Just three days after Decedent executed the 2017 Will, Dr. Jung observed that Decedent "exhibited moderate difficulty in planning, moderate difficulty in mental flexibility, severe memory difficulty, severe disorientation, severe difficulties in oral comprehension . . . moderate difficulties in oral expression, moderate reduced alertness, and mild attention difficulties." At trial, Dr. Jung testified that the frontal lobe regulates "social influences" and when the frontal lobe is compromised, a person is subject to suggestion. He opined that, given the size of the tumor and swelling in the frontal lobe found two days later by MRI, Decedent would have been susceptible to undue influence at the time he executed the will. While we agree that the evidence shows that Decedent's weakened mental state made him susceptible to undue influence, susceptibility alone is insufficient to establish undue influence. *See Chapman*, 2009-NMSC-041, ¶ 17 (holding that the presence of any one indication of undue influence is not dispositive).

**{23}**   Accordingly, we turn to Reeves-Evins' argument that Decedent's children had a confidential relationship with Decedent, and used this relationship to exploit Decedent's weakened mental state as evidenced by what Reeves-Evins characterizes as an unnatural disposition—disinheriting his wife. The evidence reflects that Decedent spent a considerable amount of time alone with his children after he was diagnosed with a malignant brain tumor while Reeves-Evins was working. Decedent's children drove Decedent to, and were present for, the initial appointment with Johnson-Vigil which ultimately led to the creation of the 2017 Will. In addition, the 2017 Will was placed in a safety deposit box the children jointly owned with their father, and Reeves-Evins did not discover the original will until after her husband's death.

**{24}**   The district court acknowledged that the children might have enjoyed a confidential relationship with the Decedent. However, the district court disagreed that the 2017 Will was an "unnatural disposition," noting that "[a]lthough disinheriting a wife may be considered unusual in the abstract, in second marriages it is frequently the plan for spouses to protect their own estates for the benefit of their own children" and that Decedent's decision to leave his estate to his children was "consistent with his prenuptial agreement." We agree. Substantial evidence supports the district court's finding that Decedent was not persuaded to disinherit Reeves-Evins as a result of undue influence from his children, but instead was a decision he made voluntarily because he was angry at Reeves-Evins for attempting to declare Decedent incapacitated and appoint herself as his guardian and conservator. In addition, although the children were present at Decedent's initial interview with Johnson-Vigil, according to Johnson-Vigil's testimony, Decedent took the lead, and the children deferred to him when it came to disposing of his property. Johnson-Vigil testified that the Decedent had a detailed list of instructions regarding items of property, as well as photographs of specific items on his phone that he displayed whenever there was a question about a specific item. Importantly, the children were not present at the will signing ceremony,

and Johnson-Vigil testified that she did not have any concerns that Decedent's children or any of his friends were pressuring him to devise his assets in a particular manner. In addition, as the district court noted, any time Decedent was represented by independent counsel, (as was the case with respect to the prenuptial agreement and the 2017 Will), Reeves-Evins was to receive nothing and independent third parties were named as fiduciaries. In contrast, when the Decedent was represented by Reeves-Evins, she was named as a fiduciary and she was to receive significant assets. This evidence reflects that Decedent's 2017 Will was consistent with other documents evincing an intent to disinherit Reeves-Evins. Finally, the fact that Decedent placed the 2017 Will in a safety deposit box co-owned by his children without telling Reeves-Evins is not significant. It is understandable that Decedent did not wish for Reeves-Evins to know the location of a will disinheriting her. Decedent continued to remain married to Reeves-Evins after the 2017 Will was executed, and placing the 2017 Will in a safety deposit box she could not access ensured she could not alter its terms, while keeping this fact a secret avoided further turmoil over its provisions.

**{25}** We decline to overturn the district court's finding that Reeves-Evins failed to put forth sufficient evidence to raise a presumption of undue influence. In order to raise the presumption, Reeves-Evins had to show that there was "enough evidence to allow the finder of fact to find *clearly and convincingly* that [a non-movant or devisee] had a confidential relationship and that suspicious circumstances existed." *Id.* ¶ 17 (emphasis added). While we agree that the evidence supports a finding that Decedent's mental state was compromised and that Decedent potentially had a confidential relationship with his children, the evidence also supports a finding that Decedent's children did not "unfairly and improperly influence[] the decedent so as to prevent him from exercising a free and understanding judgment when he executed his will." *Id.* ¶ 14 (internal quotation marks and citation omitted). When the district court hears conflicting evidence, "we defer to its determinations of ultimate fact[.]" *Skeen v. Boyles*, 2009-NMCA-080, ¶ 37, 146 N.M 624, 231 P.3d 531. "The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Pro. Fire Fighters & Int'l Ass'n of Fire Fighters*, 1997-NMCA-044, ¶ 12.

## V. Substantial Evidence Supports the District Court's Finding That Decedent Did Not Revoke the 2017 Will

**{26}** Reeves-Evins argues that substantial evidence did not support the district court's finding that Decedent did not revoke the 2017 Will. Pursuant to the relevant provisions of New Mexico's Uniform Probate Code, a will may be revoked "by performing a revocatory act on the will if the testator performed the act with the intent and for the purpose of revoking the will or part or another individual performed the act in the testator's conscious presence and by testator's direction." NMSA 1978, § 45-2-507 (A)(3) (2011). A revocatory act includes "burning, tearing, canceling, obliterating or destroying the will or any part of it." *Id.*

**{27}** Reeves-Evins alleges that on January 20, 2018, Decedent revoked the 2017 Will when he wrote "REVOKED" across the front page of a photocopy of the 2017 Will.[4] The physical revocation was witnessed and notarized. The district court found that because Decedent only revoked a photocopy of the original, the revocation was ineffective.[5] The district court further found that the original 2017 Will was in the Decedent's safety deposit box, and that he could have accessed it at any point to revoke it because it was under his control and it was in his possession. Relying on *Gushwa v. Hunt*, 2008-NMSC-064, ¶ 30, 145 N.M. 286, 197 P.3d 1, in which our Supreme Court held that a decedent's "revocatory acts performed on a mere photocopy of his original [w]ill do not comport with the statutory requirements of Section 45-2-507(A)(2)," the district court concluded that the 2017 Will was not revoked.

**{28}** Reeves-Evins argues that *Gushwa* is "not directly on point" because in *Gushwa*, the testator knew where the original will was located. *Id.* ¶¶ 2, 4. Reeves-Evins contends that because Decedent underwent a second brain surgery immediately after execution of the 2017 Will, "he may not have remembered where the original 2017 Will was after its execution," and accordingly asks this Court to construe Decedent's revocatory actions with respect to the photocopy as sufficient. We decline to do so. Our case law makes it clear that statutes providing for revocation of wills are mandatory; a will may be revoked only in the manner prescribed by statute. *Albuquerque Nat'l Bank v. Johnson*, 1964-NMSC-055, ¶ 5, 74 N.M. 69, 390 P.2d 657. "[M]ere intention alone, no matter how unequivocal, is not sufficient to effect the revocation of such a solemn instrument." *Perschbacher v. Moseley*, 1965-NMSC-068, ¶ 7, 75 N.M. 252, 403 P.2d 693; *see also Oldham v. Oldham*, 2011-NMSC-007, ¶ 10, 149 N.M. 215, 247 P.3d 736 (stating that courts "must honor legislative intent that wills and trusts be revoked in strict accordance with the statutory methods and formalities established by the [Uniform Probate Code]" and that "[r]evocation of wills and trusts is governed by mandatory statutes"); *Gushwa*, 2008-NMSC-064, ¶ 15 (stating that the "Probate Code requires an exacting attention to form as well as intent to validate a revocation"). Because the proffered revocation does not satisfy New Mexico's statutorily prescribed revocation requirements, we hold that it was insufficient to revoke the 2017 Will.

---

[4]On January 29, 2018, and again on July 20, 2018, Decedent executed an additional revocation of Powers of Attorney and Last Will and Testament Dated March 10, 2017. The revocations were notarized and filed with the Doña Ana Clerk. However, we need not address these revocations because Reeves-Evins does not develop an argument regarding these particular revocations on appeal and "[t]his Court has no duty to review an argument that is not adequately developed." *Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701.

[5]In addition, the district court acknowledged that Daniel raised concerns regarding the handwritten revocation itself that call into question its authenticity. First, the witnesses signed under the statement "we know that is what Mike wanted" with the use of the past tense implying that the witnesses did not sign contemporaneously with the Decedent. Second, Reeves-Evins acted as the Notary Public. The district court found that there is at least an implication that the handwritten revocation was manufactured after the date of death of the Decedent because the hand-written revocation document was not produced until after Daniel filed a brief explaining that the January 2018 and July 2018 revocations were legally insufficient. "If a finding is made against the party with the burden of proof, we can affirm if it was rational for the trial court to disbelieve the evidence offered by that party." *Lopez v. Adams*, 1993-NMCA-150, ¶ 2, 116 N.M. 757, 867 P.2d 427.

**VI.    We Lack Jurisdiction to Address Reeves-Evins Arguments Regarding the Temporary Restraining Order**

**{29}**    Finally, Reeves-Evins argues that the district court erred when it granted and extended the TRO prohibiting Reeves-Evins from changing or distributing assets of Decedent's estate. "Whether an order is a 'final order' within the meaning of the statute is a jurisdictional question that an appellate court is required to raise on its own motion." *Khalsa v. Levinson*, 1998-NMCA-110, ¶ 12, 125 N.M. 680, 964 P.2d 844. Generally, "an order or judgment is not considered final unless all issues of law and fact have been determined and the case disposed of by the trial court to the fullest extent possible." *Kelly Inn No. 102, Inc. v. Kapnison*, 1992-NMSC-005, ¶ 14, 113 N.M. 231, 824 P.2d 1033 (internal quotation marks and citation omitted); *see Exec. Sports Club, Inc. v. First Plaza Tr.*, 1998-NMSC-008, ¶ 5, 125 N.M. 78, 957 P.2d 63 (requiring all issues of law and fact to be determined by a final order and the case be disposed of to the extent possible to be ripe for appeal). The term " 'finality' is to be given a practical, rather than a technical, construction." *Kelly Inn No. 102, Inc.*, 1992-NMSC-005, ¶ 15.

**{30}**    Reeves-Evins argues that Daniel did not prove that the assets subject to the TRO were probate assets, nor did he prove irreparable harm, requirements which a party requesting injunctive relief is required to show. We need not address the merits of this argument, because we conclude that the TRO is not a final order over which this Court has jurisdiction on appeal. *See Capco Acquisub, Inc. v. Greka Energy Corp.*, 2007-NMCA-011, ¶ 17, 140 N.M. 920, 149 P.3d 1017 ("[O]ur appellate jurisdiction is limited to review of any final judgment or decision, any interlocutory order or decision which practically disposes of the merits of the action, or any final order after entry of judgment which affects substantial rights." (alteration, internal quotation marks, and citation omitted)). Long ago, our Supreme Court held, "[u]nless the case comes within some special statutory provisions to the contrary, an appeal will not lie from an order or decree granting, continuing, refusing, dissolving, or refusing to dissolve, a preliminary injunction, or from any other mere interlocutory order or decree." *Griffin v. Jones*, 1919-NMSC-043, ¶¶ 9-11, 25 N.M. 603, 186 P. 119 (internal quotation marks and citation omitted). Since *Griffin* was decided, appellate courts in New Mexico have carved out a narrow exception to the general rule that "a temporary restraining order is interlocutory and not appealable as a final order." *In re Doe*, 1982-NMCA-042, ¶ 4, 97 N.M. 707, 643 P.2d 271. In *Rio Arriba County Board of Education v. Martinez*, 1964-NMSC-227, ¶ 10, 74 N.M. 674, 397 P.2d 471, our Supreme Court held that a temporary restraining order was appealable because it was final for all intents and purposes because it practically disposed of the merits of the action, leaving nothing further to be litigated. In contrast, where the record reflects that the parties and the district court contemplate further proceedings, a TRO was not appealable. *Texas Pac. Oil Co. v. A. D. Jones Estate, Inc.*, 1967-NMSC-193, ¶¶ 6-8, 78 N.M. 348, 431 P.2d 490. The test "is whether the parties to the suit contemplated further proceedings." *Id.* ¶ 6. In this case the TRO issued and extended by the district court did nothing more than preserve the status quo and did not dispose of the merits of the dispute between Daniel and Reeves-Evins. The district court has not entered any order determining which assets belong to Decedent's estate, and never converted the TRO into a preliminary injunction. In addition, several motions

which were stayed by this appeal remain pending before the district court, including Reeves-Evins' motion to quash lis pendens and request for confirmation that certain properties are the property of Reeves-Evins and not probate estate assets. The record unambiguously reflects that the TRO was a temporary order that did not practically dispose of the merits of any matter between the parties and is accordingly not a final order from which an appeal lies. Such an interpretation is bolstered by the fact that the parties contemplate further proceedings, as evidenced by the motions which remain pending before the district court.

**CONCLUSION**

**{31}**   We affirm.

**{32}   IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**JANE B. YOHALEM, Judge**